UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COLETTE RAGIN,

                       Plaintiff,

     -v-

EAST RAMAPO CENTRAL SCHOOL
DISTRICT,

                  Defendant.

**MEMORANDUM OPINION
AND ORDER**

05 Civ. 6496 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Colette Ragin claims that she was subjected to race

discrimination, a hostile work environment, and retaliation in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., while employed as an assistant

principal at the East Ramapo Central School District between August 2002 and

December 2004.[1]

        Defendant moves for summary judgment on all of Plaintiff's claims,

arguing, inter alia, that Plaintiff's claims are time-barred, that its actions were justified by

---

[1] Plaintiff's Amended Complaint also asserts a gender discrimination claim. (Am.
Cmplt. ¶ 27)  In her Rule 56.1 Statement and memorandum of law opposing summary
judgment, however, Plaintiff addresses only race discrimination, hostile work
environment, and retaliation.  Accordingly, to the extent that the Amended Complaint
asserts a gender discrimination claim, that claim has been abandoned and will be
dismissed.  See Grana v. Potter, No. 06 Civ. 1173 (JFB)(ARL), 2009 WL 425913, at *15
(E.D.N.Y. Feb. 19, 2009) (considering claim abandoned because plaintiff's summary
judgment opposition "contained no factual or legal discussion" of the claim); Bronx
Chrysler Plymouth, Inc. v. Chrysler Corp., 212 F. Supp. 2d 233, 249 (S.D.N.Y. 2002)
(dismissing claim as abandoned because party opposing summary judgment "made no
argument in support of th[e] claim at all" in its summary judgment opposition papers);
Douglas v. Victor Capital Group, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (dismissing
as abandoned claims that defendants addressed in motion for summary judgment but
plaintiff failed to address in his opposition papers).

legitimate concerns about Plaintiff's job performance, that Plaintiff was never subjected to a hostile work environment, and that it did not retaliate against her for engaging in protected activity.  For the reasons stated below, Defendant's motion for summary judgment (Docket No. 25) will be GRANTED.

## BACKGROUND

In August 2002, the School District hired Ragin, an African-American female, to serve as the assistant principal of Lime Kiln Elementary School.  (Def. Rule 56.1 Stat. ¶ 5)[2]  Neil Kaplicer, Lime Kiln's principal and a white male, recommended her for this position.  (Id. ¶ 6)  Plaintiff was employed by the District for two and a half years until her termination in December 2004. (Id. ¶ 7)

### A.    Custodian's Alleged Sexual Harassment

Plaintiff alleges that in November 2003, when she was in a supply closet obtaining construction paper, and in January 2004, when she was in a storage room obtaining binders, custodian Robert Manion's hand "grazed" her buttocks.  (Pltf. Rule 56.1 Counter-Stat. ¶ 34; Johnson Aff., Ex. H.)  Plaintiff alleges that she verbally complained to Principal Kaplicer after each incident.  (Pltf. Rule 56.1 Resp. ¶ 56; Ragin Aff. ¶ 20)  After the November 2003 incident, Kaplicer spoke with Manion, who explained that he had touched Ragin on the side "to try to get past her."  Kaplicer told Manion to "be more careful" but was apparently satisfied that this contact was innocuous.

---

[2]  To the extent that this Court relies on facts drawn from Defendant's Rule 56.1 statement, it has done so because Ragin has not disputed those facts or has not done so with citations to admissible evidence.  Where Ragin disagrees with Defendant's characterization of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on her characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

(Pltf. Rule 56.1 Counter-Stat. ¶¶ 42–45; Sussman Aff. Ex. 1 at 9–11, 15)  Manion retired

from the District in January 2004 (Def. Rule 56.1 Stat. ¶ 22; Johnson Aff., Ex. X at 15),

and at about the same time, Kaplicer announced that he would retire at the end of the

2003–04 school year.  (Def. Rule 56.1 Stat. ¶ 18; Johnson Aff., Ex. Y at 107)

 On June 4, 2004 – shortly before Kaplicer's June 30, 2004 retirement –

Ragin sent a letter to him recounting her accusations against Manion, who had since

retired.  She "formally request[ed] [Kaplicer's] . . . prompt attention to this matter."

(Johnson Aff., Ex. H; Pltf. Rule 56.1 Counter-Stat. ¶ 56; Def. Rule 56.1 Stat. ¶ 61)

 **B.** **January 2004 Performance Evaluation**

 During the 2002-03 school year, Ragin received two positive performance

evaluations from Principal Kaplicer.  (Pltf. Rule 56.1 Counter-Stat. ¶¶ 7, 14; Ragin Aff.,

Ex. 9, Ex. 10)  Kaplicer's January 2004 mid-year review of Ragin continued to rate her as

"satisfactory," but contained complaints about her scheduling and budgeting skills, and

communications with the District's central administration.  (Johnson Aff., Ex. W; see

also Def. Rule 56.1 Stat. ¶ 24; Pltf. Rule 56.1 Resp. ¶ 24, Pltf. Rule 56.1 Counter-Stat. ¶

17)  Ragin filed a rebuttal to the January 2004 evaluation on February 13, 2004, in which

she stated that she "accept[ed] the evaluation" but argued that it did not acknowledge "the

full range of [her] accomplishments/contributions."  (Johnson Aff., Ex. C; Def. Rule 56.1

Stat. ¶ 26; Pltf. Rule 56.1 Resp. ¶ 19; Johnson Aff., Ex. K at 245–46; see Ragin Aff., Ex.

2)

 Plaintiff and Kaplicer later met with Assistant Superintendent Linda Cruz.

(Def. Rule 56.1 Stat. ¶ 28; Pltf. Rule 56.1 Resp. ¶ 28; Cruz Aff. ¶ 7)  The parties dispute

what was discussed at this meeting.  Defendant alleges that the "combative relationship"

between Plaintiff and Kaplicer was discussed as well as Ragin's poor attendance, non-responsiveness to directives, and failure to notify the school about her absences (Def Rule 56.1 Stat ¶¶ 28-29; Cruz Aff. ¶ 7), while Ragin asserts that the only issue that was discussed was her complaints about Kaplicer's alleged withdrawal of support for a Motown production she had organized at the school to celebrate Black History Month. (Def. Rule 56.1 Stat. ¶ 30; Pltf. Rule 56.1 Resp. ¶¶ 28-30; Sussman Aff., Ex. 2 at 93–96; Cruz Aff. ¶ 7; Ragin Aff. ¶ 14)

### C.  <u>Application for Promotion</u>

On February 12, 2004, Ragin applied for three vacant principal positions within the District for the 2004–05 school year.  (Def. Rule 56.1 Stat. ¶ 32)  After proceeding through an initial screening process designed to narrow the applicant pool, Plaintiff was granted an interview on March 30, 2004 for the Lime Kiln principal vacancy only. (<u>Id.</u> ¶¶ 35– 36; Sculnick Aff. ¶ 13, Johnson Aff., Ex. E)  She was one of thirteen candidates selected for a second-round interview, which took place on April 27, 2004. (Def. Rule 56.1 Stat. ¶¶ 41, 44)  Plaintiff was not selected as a finalist by the interview committee, however, and the position was ultimately offered to another female African-American candidate, Lori Lowe-Stokes. (<u>Id.</u> ¶¶ 46, 49–50)  On May 21, 2004, Plaintiff received formal notification that she had not been selected to fill the Lime Kiln principal vacancy.  (<u>Id.</u> ¶ 51)

### D.  <u>Continuing Difficulties with Kaplicer</u>

On May 12, 2004, Ragin met with Assistant Superintendent Mitchell Schwartz and Director of Personnel Mary Sculnick to discuss her strained relationship with Kaplicer.  (<u>Id.</u> ¶ 55; Schwartz Aff. ¶ 5; Sculnick Aff. ¶ 5)  At the meeting, Plaintiff

4

told Sculnick and Schwartz that Manion had inappropriately touched her in November 2003 and January 2004.  (Def. Rule 56.1 Stat. ¶ 56; Schwartz Aff. ¶ 5; Sculnick Aff. ¶ 5) Schwartz scheduled a meeting for Ragin with Assistant Superintendent Cruz on June 1, 2004 to discuss these allegations.  (Def. Rule 56.1 Stat. ¶ 60)  When Cruz came to Lime Kiln for the June 1 meeting, however, Plaintiff was not at the school.  (Id.; Johnson Aff., Ex. K at 294–95)  Cruz reprimanded Plaintiff for her absence.  (Ragin Aff., Ex. 16) Plaintiff claims that she had obtained permission from Kaplicer to attend a wedding that day (Ragin Aff. ¶ 22, Ex. 3), and that Kaplicer should have explained this to Cruz when Cruz asked where Plaintiff was.  (Pltf. Rule 56.1 Counter-Stat. ¶¶ 94–96)

On June 22, 2004, a Lime Kiln teacher brought Kaplicer four pages of pornographic images that a Lime Kiln student had allegedly printed out using a school computer.  As Assistant Principal, Ragin was responsible for student discipline and for technology at Lime Kiln.  (Def. Rule 56.1 Stat. ¶ 78)  Accordingly, Kaplicer gave these images to Ragin and asked her to investigate the incident.  (Id. ¶¶ 80-81)  In doing so, Kaplicer warned her that the images were "disgusting and graphic."  (Id. ¶¶ 76–82)  After seeing the images, Plaintiff objected to conducting the investigation.  Kaplicer then offered to take the material back.  (Id. ¶ 85)  Plaintiff refused to return the images, however, completed her investigation, and concluded that the incident had in fact involved student misconduct and misuse of school computers.  (Id. ¶¶ 86–87)

### E.    June 25, 2004 Sexual Harassment Complaint

On June 25, 2004, Plaintiff sent a letter to Director of Personnel Sculnick complaining that Kaplicer had sexually harassed her when he asked her to investigate the pornographic images.  (Johnson Aff., Ex. J)  In the letter, Ragin also accused Kaplicer of

"never investigat[ing] or address[ing]" an "outstanding sexual harassment complaint" she had made – an apparent reference to the Manion incidents.  (Id.)  The District then conducted a formal investigation into Plaintiff's allegations concerning both the Manion incidents and the pornographic images, and issued a report on December 17, 2004, concluding that no sexual harassment had taken place.  (Johnson Aff., Ex. Q; Def. Rule 56.1 Stat. ¶¶ 92–93, 99)

   In rejecting Plaintiff's allegations against Manion, the District noted that he had denied purposefully touching her in an inappropriate manner, that her June 4 memorandum had alleged that Manion's hand had merely "grazed" her buttocks – and that Webster's New Collegiate Dictionary defines "graze" as "to touch lightly in passing" – and that in any event Manion had retired from the school six months earlier and accordingly "the School District could not impose any penalty against him."  (Johnson Aff., Ex. Q at 10)  In rejecting Ragin's claims concerning the pornographic images, the District noted that Ragin did not contest that she was responsible for student discipline and technology, and that, accordingly, Kaplicer did not commit sexual harassment in asking her to investigate an incident that involved potential misuse of a school computer by a student.  (Id. at 11)

   **F.**  **June 2004 Performance Evaluation**

   On June 17, 2004, Kaplicer gave Ragin a year-end evaluation that rated her performance as "unsatisfactory."  (Def. Rule 56.1 Stat. ¶ 66; Johnson Aff., Ex. I, Ex. K at 333–34; Pltf. Rule 56.1 Resp. ¶ 66)  In the evaluation, Kaplicer stated that Plaintiff had not completed her assigned work in a timely fashion, including certain teacher evaluations, had a record of poor attendance, had repeatedly failed to notify the District

of her absences, interacted poorly with supervisors, and had failed to improve in the areas criticized in her January 2004 evaluation.  (Def. Rule 56.1 Stat. ¶¶ 67–72; Johnson Aff. ¶ 5, Ex. I)

On June 21, 2004, Plaintiff wrote a rebuttal to the review, stating:  "Please be advised this evaluation is a form of retaliation and it's evidence of Neil Kaplicer punishing me for being sick; i.e., observations not performed in a timely fashion."[3]  (Def. Rule 56.1 Stat. ¶ 73; Johnson Aff., Ex. I, Ex. K at 333–34)

### G.   <u>Transfer to Fleetwood Elementary School</u>

In June 2004, the District reassigned a number of assistant principals for the 2004–05 school year and decided to transfer Ragin to Fleetwood Elementary School (Def. Rule 56.1 Stat. ¶¶ 100–01; Schwartz Aff. ¶ 7; Johnson Aff., Ex. Z at 44), allegedly to give her a fresh start at a new school.  (Def. Rule 56.1 Stat. ¶ 102; Friedman Aff. ¶ 8; Simmons Aff. ¶ 3; Cruz Aff. ¶ 10)  At Fleetwood, Ragin continued to serve as an assistant principal, but reported to Fleetwood Principal Patricia Simmons, an African-American woman.  (Def. Rule 56.1 Stat. ¶¶ 103–05; Friedman Aff. ¶ 8; Simmons Aff. ¶¶ 1, 3)

On September 9, 2004, Principal Simmons gave Ragin a list of her job responsibilities and Simmons' expectations for the coming school year.  Plaintiff repeatedly refused to sign or acknowledge the list, however, citing advice from her union. (Def. Rule 56.1 Stat. ¶¶ 108-09, 111; Simmons Aff. ¶¶ 4, 6, Ex. M; Simmons Reply Aff. ¶ 2; Johnson Aff., Ex. M; Pltf. Rule 56.1 Resp. ¶¶ 109–11; Ragin Aff. ¶ 31)  Ragin's

_____

[3]  On June 8, 2004, Plaintiff requested and received an accommodation for a medical condition that made it difficult for her to type.  Plaintiff alleges that this condition prevented her from completing the teacher evaluations on time.  (Ragin Aff., Ex. 21)

attendance at Fleetwood was – in her words – "inconsistent."  (Johnson Aff., Ex. K at 259–60; Def. Rule 56.1 Stat. ¶ 114; Pltf. Rule 56.1 Resp. ¶ 114)  During the three-and-a - half months between her September start date and mid-December, Ragin missed twenty-two days of work, her full yearly allotment of sick days under the union contract.  (Def. Rule 56.1 Stat. ¶ 113; Simmons Aff. ¶ 5, Ex. N; Ragin Aff., Ex. 44)  Ragin provided doctor's notes for many of these absences, however.  (Pltf. Rule 56.1 Resp. ¶ 113; Ragin Aff. ¶32)

### H.     Ragin Accepts a Position with the Newburgh School District

During her first semester at Fleetwood, Plaintiff began searching for a new job, and by October 2004, she had "made inquiry" about a principal position in the Newburgh School District.  (Def. Rule 56.1 Stat. ¶ 120; Pltf. Rule 56.1 Resp. ¶ 120)  At some point between Thanksgiving and November 30, 2004, Ragin learned that the Newburgh School District superintendent was going to recommend to Newburgh's Board of Education that Ragin be appointed to a principal position, the duties of which would commence in January 2005.  (Def. Rule 56.1 Stat. ¶ 122; Johnson Aff., Ex. A at 179)

On November 30, 2004, the Newburgh Board of Education officially appointed Ragin principal of the Horizons-on-Hudson elementary school.  Ragin received formal written notice of this appointment in a December 1, 2004 letter from the Newburgh School District.  (Def. Rule 56.1 Stat. ¶¶ 123, 125; Johnson Aff., Ex. A at 173–75, Ex. R)  The appointment was for a three-year period, with salary and duties commencing on January 3, 2005.  (Def. Rule 56.1 Stat. ¶¶ 123, 137; Johnson Aff., Ex. A at 176, Ex. R)  By the first week of December 2004, Plaintiff had accepted the Newburgh principal position.  (Def. Rule 56.1 Stat. ¶ 126; Pltf. Rule 56.1 Resp. ¶ 126)  Ragin never

disclosed to Defendant that she had accepted the Newburgh principal position[4] and instead – on December 9, 2004 – arranged for her union counsel to attempt to negotiate a settlement with Defendant in which Ragin would resign from her position at Fleetwood in exchange for a grant of tenure and $125,000.  (Def. Rule 56.1 Stat. ¶¶ 127-29; Pltf. Rule 56.1 Resp. ¶¶ 127-29; Johnson Aff., Ex. B)

I.    **Plaintiff's Termination**

On December 14, 2004, at least one week after Ragin had accepted the Newburgh position, Principal Simmons sent a letter to Assistant Superintendent Cruz recommending that Plaintiff's employment be terminated.  (Def. Rule 56.1 Stat. ¶ 131; Simmons Aff. ¶ 8, Ex. N; Cruz Aff. ¶ 12)  In explaining her recommendation, Simmons cited, inter alia, Plaintiff's "frequent and unannounced absences, inability to focus on work, and erratic and unprofessional behavior."  (Simmons Aff. ¶¶ 5, 8; Johnson Aff., Ex. N; see also Def. Rule 56.1 Stat. ¶ 132)

On December 15, 2004, Assistant Superintendent Cruz sent a letter to Superintendent Friedman concurring in Simmons' recommendation.  (Def. Rule 56.1 Stat. ¶ 133; Friedman Aff. ¶ 9; Cruz Aff. ¶ 12; Johnson Aff., Ex. U)  Later that day, Superintendent Friedman sent a letter to Ragin informing her that he would recommend to the East Ramapo Board of Education that Plaintiff's employment with the District be terminated.  (Def. Rule 56.1 Stat. ¶ 134; Friedman Aff. ¶ 10; Johnson Aff., Ex. S) Friedman's letter instructed Ragin to no longer report to Fleetwood, but stated that she

---

[4]  The parties have cited no evidence indicating that Defendant was even aware that Ragin had sought employment in Newburgh.

would receive full pay and benefits through her termination date of February 18, 2005. (Johnson Aff., Ex. S)

After Ragin demanded that Superintendent Friedman explain the reasons for his recommendation, Friedman sent Ragin a letter dated December 22, 2004, listing the deficiencies in her job performance.  (Def. Rule 56.1 Stat. ¶ 135; Friedman Aff. ¶ 11; Johnson Aff., Ex. O)  Friedman's letter notes, inter alia, that Ragin had failed to comply with directives from her superiors, was frequently absent without explanation, consistently arrived late to school and left early, had failed to complete a substantial amount of her assigned work, had shown consistently weak performance in the areas of "scheduling, budgets, and communications with the Central Administrative offices," and spent an excessive amount of time on her computer and cell phone attending to non-school related matters.  (Friedman Aff. ¶ 11; Johnson Aff., Ex. O; Simmons Aff. ¶¶ 5, 8; Cruz Aff. ¶¶ 10–12; see also Def. Rule 56.1 Stat. ¶ 136)  Friedman also noted that Plaintiff "often acted in an unprofessional manner with various staff members, demonstrating a pattern of negative interactions with them" (Friedman Aff. ¶ 11; Johnson Aff., Ex. O; Simmons Aff. ¶¶ 5, 8; Cruz Aff. ¶¶ 10–12; see also Def. Rule 56.1 Stat. ¶ 136), and that she had "show[n] an inability to compromise and accept input from others without becoming angry and defensive."  (Friedman Aff. ¶ 11; Johnson Aff., Ex. O; Simmons Aff. ¶¶ 5, 8; Cruz Aff. ¶¶ 10–12; see also Def. Rule 56.1 Stat. ¶ 136)

On January 18, 2005, the District's Board of Education accepted Superintendent Friedman's recommendation and voted to terminate Ragin's employment. (Def. Rule 56.1 Stat. ¶ 143; Friedman Aff. ¶ 13; Johnson Aff., Ex. T)  On February 18,

2005, Plaintiff's termination became official and she was removed from the District's payroll.  (Def. Rule 56.1 Stat. ¶ 144; Friedman Aff. ¶ 13; Johnson Aff., Ex. T)

Plaintiff's appointment to the Newburgh school principal position became effective on January 3, 2005, and she began collecting a salary for this position on that date.  (Def. Rule 56.1 Stat. ¶¶ 123, 137; Johnson Aff., Ex. A at 176, Ex. R)  Between January 3, 2005, and February 18, 2005, Plaintiff held full-time administrative positions in both Newburgh and East Ramapo, and was receiving a salary for both positions.  (Def. Rule 56.1 Stat. ¶ 140; Johnson Aff., Ex. A at 173–75, Ex. K at 241–42)

On January 6, 2005, Plaintiff filed a charge of discrimination with the EEOC alleging sexual harassment, hostile work environment, race discrimination, retaliation, and "disability accommodation concerns."  (Johnson Aff., Ex. AA; Johnson Reply Aff., Ex. EE)  On March 30, 2005, the EEOC dismissed Plaintiff's complaint, finding that she had failed to state a claim.  Ragin commenced the instant action on June 29, 2005.[5]  (Def. Rule 56.1 Stat. ¶¶ 148–49; Johnson Aff., Ex. BB; Docket No. 2)

## DISCUSSION

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d

---

[5]  This case was reassigned to this Court on November 17, 2008. (Docket No. 40)

Cir. 2008).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (internal quotation omitted).  As in any other case, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.' . . . She must come forth with evidence sufficient to allow a reasonable jury to find in her favor."  Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

"Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion.  Gross v. National Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context ... a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").  Instead, the plaintiff must offer "concrete particulars."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 451-52 (2d Cir. 1999) (disregarding plaintiff's Rule 56(e) affidavit because it lacked "concrete particulars"); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985)  ("To allow a party to

defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

## II.   LEGAL ANALYSIS

### A.   Timeliness of Claims

Defendant argues that Ragin's claims are time-barred because she did not commence this action within 90 days of receipt of a right-to-sue letter. See Sherlock v. Montefiore Medical Ctr., 84 F.3d 522, 525 (2d Cir. 1996) ("In order to be timely, a claim under Title VII . . . must be filed within 90 days of the claimant's receipt of a right to sue letter.") (emphasis added); 42 U.S.C. § 2000e-5(f)(1).

Ragin's right-to-sue letter from the EEOC is dated March 30, 2005.  (Def. Rule 56.1 Stat. ¶ 148; Johnson Aff., Ex. BB)  It may be assumed, in the absence of a challenge, that a notice provided by a government agency has been mailed on the date indicated on the notice.  Sherlock, 84 F.3d at 526 (citing Baldwin County Welcome Center v. Brown, 466 U.S. 147, 148 & n.1 (1984) (per curiam)).  "Normally it is assumed that a mailed document is received three days after its mailing."  See id. at 525.  Here, the parties do not dispute that the EEOC right-to-sue letter was mailed on March 30, 2005, and that Plaintiff received the letter three days later, on April 2, 2005.  See Williams v. Salvation Army, 108 F. Supp. 2d 303, 307 (S.D.N.Y. 2000).  Because the statutory clock is triggered by Ragin's receipt of the EEOC letter on April 2, 2005, she had until July 1, 2005, to commence this action.

Although this action was not officially commenced until July 18, 2005 – after the ninety-day period had expired (Docket No. 2) – Plaintiff filed her complaint

with this Court's Pro Se office on June 29, 2005.[6]  (Sussman Aff. Ex. 8)  At that time,

Plaintiff also filed an in forma pauperis application with the Court, which was eventually

granted. (Docket No. 1)

   In Toliver v. County of Sullivan, 841 F.2d 41, 42 (2d Cir. 1988) (per

curiam), the Second Circuit held that "[a]t least when in forma pauperis relief is granted,

the action should be treated as timely, provided the complaint was received by the clerk's

office prior to the expiration of the limitations period."  Defendant argues, however, that

this equitable tolling rule should not apply here, because Ragin's in forma pauperis

application is fraudulent, in that she affirmed under penalty of perjury (and dismissal of

her case) that her income was only $4,600 per month when in fact she was earning

$8,151 per month.  (Def. Reply Br. at 4-5; see Johnson Aff., Ex. A at 173-74, Ex. R;

Johnson Reply Aff., Ex. DD)  Defendant further argues that Ragin is a highly

experienced litigant, having sued four separate employers, including Defendant, for

alleged discrimination and/or sexual harassment.  (Def. Reply Br. at 5; see Def. Rule 56.1

Stat. ¶¶ 3-4, 154-56)

   While Defendant's allegations are disturbing, they do not provide a basis

for this Court to find that Plaintiff's claims are time-barred.  As an initial matter,

Defendant improperly raised this argument for the first time in its reply brief.  See, e.g.,

Playboy Enters., Inc. v. Dumas, 960 F. Supp. 710, 720 n.7 (S.D.N.Y.1997) ("Arguments

made for the first time in a reply brief need not be considered by a court.").  Moreover,

"[i]n the wake of Toliver, district courts are ruling that all complaints filed by pro se

litigants are filed at the time of receipt by the Pro Se Office, regardless of whether they

---

[6]  Plaintiff filed this action pro se but later retained counsel. (Docket No. 16)

are accompanied by an <u>in forma pauperis</u> application." <u>Smith v. Henderson</u>, 137 F. Supp. 2d 313, 317 (S.D.N.Y. 2001) (citing <u>Judge v. New York City Transit Auth</u>., No. 99 Civ. 0927 (JGK), 1999 WL 1267462, at *1 (S.D.N.Y. Dec. 29, 1999); <u>Johnson v. National Football League</u>, No. 99 Civ. 8582 (DC), 1999 WL 892938, at *2 (S.D.N.Y. Oct. 18, 1999); <u>Shabazz-Allah v. Guard Mgmt. Serv</u>., No. 97 Civ. 8194 (LBS), 1999 WL 123641, at *1 n.1 (S.D.N.Y. Mar. 8, 1999)).

Because Plaintiff commenced this action as a matter of law on June 29, 2005, when she filed her complaint with the Pro Se Office, this action was initiated within the requisite ninety-day period after receipt of the EEOC's right-to-sue letter. Accordingly, Plaintiff's claims are timely.

> **B.** **<u>Title VII Race Discrimination Claim</u>**

The framework for analyzing Title VII cases is well established:

> [Under] the familiar "burden-shifting" framework set forth for Title VII cases by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973) and <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981), . . . the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action.  If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

<u>Holcomb</u>, 521 F.3d at 138 (quoting <u>Burdine</u>, 450 U.S. at 253).

To establish a <u>prima facie</u> case of race discrimination, Plaintiff must show: "(1) that she belonged to a protected class; (2) that she was qualified for the position she held; (3) that she suffered an adverse employment action; and (4) that the adverse

employment action occurred under circumstances giving rise to an inference of discriminatory intent." Holcomb, 521 F.3d at 138. Here, Defendant asserts that Ragin cannot establish the third and fourth elements of a prima facie case, and that even if she could, the School District has articulated legitimate, non-discriminatory reasons for its actions, which Plaintiff has not rebutted. (Def. Br. 11)

Plaintiff's burden in establishing a prima facie case "'is not onerous'" – indeed, it is "de minimis," Beyer, 524 F.3d at 163 – and is satisfied by "'evidence that raises a reasonable inference that the action taken by an employer was based on an impermissible factor.'" Holcomb, 521 F.3d at 138 (quoting Burdine, 450 U.S. at 253). While a low standard applies to the prima facie case determination, "a plaintiff's case must fail if [she] cannot carry this preliminary burden." Beyer, 524 F.3d at 163.

Here, Plaintiff's claim that she suffered an adverse employment action rests solely on her termination.[7] Defendant argues that because Ragin had already accepted alternate employment when she was told that the Superintendent would be recommending her termination, she cannot be found to have suffered an adverse employment action. Defendant further argues that even if Plaintiff's termination could constitute an adverse employment action, it did not occur under circumstances giving rise to an inference of discriminatory intent. Each argument is considered separately below.

### 1.    Adverse Employment Action

Defendant argues that it is entitled to summary judgment on Plaintiff's race discrimination claim because, at the time Plaintiff was suspended and notified of her

---

[7] In her opposition brief, Plaintiff withdraws any claim that she was denied a promotion because of her race. (Pltf. Br. 30 n.5)

impending termination, she had already accepted new employment as principal of the Horizons-on-Hudson Elementary School in Newburgh.  (Def. Br. 9-10)  Accordingly, Defendant asserts that Plaintiff cannot be said to have suffered an adverse employment action and therefore cannot state a prima facie case of race discrimination under the McDonnell-Douglas framework.  (Id.)  Neither party cites a case involving similar circumstances, and this Court has found no case directly on point.

As discussed above, it is undisputed that Plaintiff was appointed by Newburgh's board of education to fill a full-time principal position on December 1, 2004, and that she had accepted that position by the first week of December, before Defendant had taken any adverse employment action against her.  (Johnson Aff., Ex. R, Ex. K at 241, Ex. A at 174-75)  Ragin did not disclose to Defendant that she had accepted the Newburgh principal position and would have to resign from her East Ramapo job, however, because she was, at the same time, attempting to persuade Defendant to pay her to resign from a position that she had already effectively abandoned.  Accordingly, on December 9, 2004, Ragin arranged for her union counsel to send a proposed settlement agreement to Defendant, pursuant to which Ragin would resign in exchange for, inter alia, a grant of tenure and $125,000.  (Def. Rule 56.1 Stat. ¶¶ 127-29; Pltf. Rule 56.1 Resp. ¶¶ 127-29; Johnson Aff., Ex. B)  Superintendant Friedman instead chose to recommend her termination on December 15, 2004 (Johnson Aff., Ex. S; Def. Rule 56.1 Stat. ¶ 134), and the East Ramapo Board of Education voted to terminate Plaintiff's employment on January 18, 2005, with an effective date of February 18, 2005.  (Johnson Aff., Ex. T)

In the context of a race discrimination claim, for conduct to constitute "an adverse employment action" it must cause a "materially adverse change in the terms and conditions of employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). This nation's discrimination laws speak of "material adversity" because "it is important to separate significant from trivial harm." Burlington Northern & Sante Fe R.R. Co. v. White, 548 U.S. 53, 68 (2006). Here, Ragin did not suffer any materially adverse change in the terms and conditions of her East Ramapo employment, because – by accepting the fulltime principal position in Newburgh – she had already effectively abandoned her East Ramapo assistant principal job. Cf. Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997) ("Title VII . . . protects individuals from actions injurious to current employment or the ability to secure future employment"; holding "that the loss of an office and phone by an employee who has already been informed of a termination decision, and is waiting out his numbered days on the payroll . . . does not . . . amount to adverse employment action") (emphasis in original).

While Plaintiff argues that Defendant "has not shown that plaintiff would have left the District and commenced employment in Newburgh absent the adverse action which commenced with her December 14, 2004 suspension" (Pltf. Br. 11), this argument is misplaced. Ragin has not alleged in either her brief or her Rule 56.1 Statement that she intended to stay at East Ramapo. Indeed, all of the evidence is to the contrary. Ragin made her choice during the first week of December when she accepted the Newburgh position. (Johnson Aff., Ex. R, Ex. K at 241, Ex. A at 174-75) She chose not to disclose that choice as part of a campaign to extract a settlement from the School District, but Ragin's scheme does not change the fact that she had chosen to accept the Newburgh

18

position and therefore surrender the East Ramapo position before Defendant took any adverse employment action against her.

In accepting the Newburgh position before Defendant had taken any adverse employment action against her, Ragin effectively voluntarily resigned from her East Ramapo job.  In this Circuit, in the race discrimination context, once an employee has voluntarily resigned or informed their employer of their intention to resign, the employee cannot suffer an adverse employment action.  See, e.g., Memnon v. Clifford Chance US, LLP, No. 08 Civ. 2874 (HB), 2009 U.S. Dist. LEXIS 99936, at *16-18 (S.D.N.Y. Oct. 27, 2009) (concluding that there had been no adverse employment action because all adverse acts took place after plaintiff had executed a settlement agreement that provided for her resignation); Regis v. Metropolitan Jewish Geriatric Ctr., No. 97 Civ. 0906 (ILG), 2000 U.S. Dist. LEXIS 2215, at *20-21 (E.D.N.Y. Jan. 11, 2000) (finding that plaintiff had failed to make out a prima facie case of retaliation where the adverse actions took place after she tendered her notice of resignation); see also Evans v. Davie Truckers, Inc., 769 F.2d 1012, 1014 (4th Cir. 1985) (because the "evidence clearly established that [the employee] voluntarily resigned his employment with the defendant, [he] suffered no adverse employment action at the hand of the defendant" (internal quotation marks omitted)).

In Memnon v. Clifford Chance US, LLP, the plaintiff was a law firm associate who asserted race discrimination and retaliation claims.  See Memnon, 2009 U.S. Dist. LEXIS 99936, at *2-3.  After complaining about the firm's allegedly discriminatory practices, the plaintiff resigned pursuant to a settlement agreement.  Id. The plaintiff later sued the firm for employment discrimination, however, claiming that it

had refused to provide a recommendation letter and gave negative references to prospective employers.  See id.  The district court ruled that the plaintiff could not establish a prima facie case:  "there has been no adverse employment action taken against her because all of the conduct that gives rise to her allegations against Clifford Chance occurred after she resigned pursuant to the Settlement Agreement."  Id. at *16-17.

   Similarly, in Regis v. Metropolitan Jewish Geriatric Ctr., the court concluded that the plaintiff had failed to establish a prima facie case of retaliation where she had tendered her notice of resignation before the asserted adverse employment action took place.  Regis, 2000 U.S. Dist. LEXIS 2215, at *20-21.  In Regis, the plaintiff – a nurse – resigned on July 18, 1994, with her resignation effective on August 26, 1994.  Id. at *13.  On July 25, 1994, the plaintiff accepted employment with another agency.  After an altercation between the plaintiff and another of the defendant's employees on July 25, 1994 about whether Regis would complete certain work before she left, the employer decided that Regis' employment would be terminated immediately and that she would not work through August 26.  Regis argued that she suffered an adverse employment action when the employer moved up her resignation date.  Id. at *20.  The court disagreed.  In deciding that the plaintiff had suffered no adverse employment action, the court placed particular emphasis on the fact that the employee had already accepted new employment.  Id. at *20 ("At that time, [plaintiff] already had one job in hand . . . [and] was offered a second new job.").[8]  Similarly, by the time Ragin was informed of the Superintendant's

---

[8]  The Regis decision was issued before White, 548 U.S. at 67, in which the Supreme Court held that "Title VII's substantive provision and its antiretaliation provision are not coterminous," and that the scope of the anti-retaliation provision extends beyond workplace-related or employment-related acts and harm.  The logic of Regis is directly

20

decision to recommend her termination, she not only had been offered new employment, she had accepted it.  (Def. Rule 56.1 Stat. ¶ 126; Johnson Aff., Ex. K at 241)

By accepting the fulltime Newburgh position, Ragin voluntarily gave up her East Ramapo position, although she chose not to disclose this to Defendant for strategic reasons.[9]  Having taken steps that required her to resign from her East Ramapo position before Defendant took any adverse employment action against her, Ragin cannot be said to have suffered a "materially adverse change in the terms and conditions of employment" when Defendant announced that she would be terminated.  Galabya, 202 F.3d at 640.  Accordingly, Defendant is entitled to summary judgment on Ragin's race discrimination claim.

### 2.        Inference of Discriminatory Intent

Even if this Court could find that Ragin suffered an adverse employment action, she has failed to offer evidence that could allow a reasonable jury to find that her termination occurred under circumstances giving rise to an inference of discrimination. "[D]rawing all inferences in Plaintiff's favor," Ragin has not met the "low threshold" and minimal showing necessary to make out the fourth element of a prima facie case. Holcomb, 521 F.3d at 139 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)).

---

applicable to Ragin's race discrimination claim, however, where the more restrictive test for "adverse employment action" applies.

[9]  Whether the employer is aware that the employee has accepted another position that requires him or her to resign is beside the point, because the analysis turns on whether the employee has suffered a "materially adverse change in the terms and conditions of employment," Galabya, 202 F.3d at 640, and not on the employer's knowledge.

"It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." Leibowitz v. Cornell University, 584 F.3d 487, 502 (2d Cir. 2009). Here, the only evidence in the record that could possibly show racially discriminatory animus involves Kaplicer's alleged actions and comments.

Plaintiff alleges that Kaplicer yelled at her for inviting an NAACP official to address students at Lime Kiln (Ragin Aff. ¶ 143), and that after he was passed over for a promotion to superintendent, Kaplicer told her that the District favored minorities. (Pltf. Rule 56.1 Resp. ¶ 20; Ragin Aff. ¶ 8) Plaintiff also claims that Kaplicer "had distanced himself" from the planning of an event celebrating Motown and "had offered weak support for it." (Pltf. Rule 56.1 Resp. ¶ 28)

Assuming arguendo the truth of these assertions, they provide no basis for denying summary judgment. The critical question here is whether those involved in the decision to terminate Ragin's employment – Principal Simmons, Assistant Superintendent Cruz, and Superintendant Friedman – acted with discriminatory animus. Kaplicer's comments are not probative on that point. Kaplicer retired in June 2004, more than five months before the District decided to terminate Plaintiff, and Ragin has offered no evidence suggesting that the retired principal in any way influenced Simmons, Cruz, or Friedman when they made their decisions that Plaintiff's employment should be terminated. In sum, no jury could rationally infer from Kaplicer's alleged statements that

Simmons, Cruz, or Friedman acted with discriminatory intent, and Kaplicer's alleged discriminatory animus cannot be imputed to them.  See Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115-16 (2d Cir. 2007) (stating that "all comments pertaining to a protected class are not equally probative of discrimination," and explaining that "[t]he relevance of discrimination-related remarks . . . depend[s] . . . on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class" (emphasis added)); see also McLee v. Chrysler Corp., 109 F.3d 130, 137 (2d Cir. 1997) (evidence of racial bias on part of employee who did not make decision to fire plaintiff and was not consulted about decision "provide[s] no basis for imputing to . . . [the decision-maker] an invidious motivation for discharge").

As to the individuals responsible for recommending Plaintiff's termination – Simmons, Cruz, and Friedman – no jury could rationally infer that they acted with discriminatory intent.

Cruz and Simmons – who was Ragin's direct supervisor and whose complaints and poor reviews formed the basis for Ragin's termination – are both African-American women.[10]  (Def. Rule 56.1 Stat. ¶ 105; Simmons Aff ¶ 1; Cruz Aff. ¶ 3)  The fact that two of the three alleged decision-makers – including Ragin's direct supervisor – are African-American undermines any inference of discriminatory animus.  See Eder v.

_____

[10]  In her Rule 56.1 Statement (Pltf. Rule 56.1 Resp. ¶ 158), Plaintiff denies – without any explanation or supporting citations – that Cruz is African-American.  This is not sufficient to put this fact into dispute.  "[D]istrict courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that where there are no[] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion."  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001).  Cruz attests in her affidavit (Cruz Aff. ¶ 3) that she is of African-American and Hispanic descent, and given that Plaintiff has not presented any evidence to the contrary, the Court accepts her representation as true.

City of New York, No. 06 Civ. 13013 (RWS), 2009 U.S. Dist. LEXIS 11501, at *23

(S.D.N.Y. Feb. 12, 2009) (Plaintiff and his "immediate supervisor [–] who assessed

Plaintiff's performance and determined that it was lacking [–] are members of the same

protected class. . . . Thus, any inference of discrimination, without additional evidence, is

not warranted."); Tucker v. New York City, No. 05 Civ. 2804 (GEL), 2008 U.S. Dist.

LEXIS 76900, at *17 (S.D.N.Y. Sept. 30, 2008) ("[A]ny inference of race discrimination

is further undermined by the fact that all three superintendents under whom [plaintiff]

worked as well as three of his four direct supervisors at the DOE were also African-

American." (citing Fosen v. New York Times, No. 03 Civ. 3785 (KMK) (THK), 2006

U.S. Dist. LEXIS 75662, at *5 (S.D.N.Y. Oct. 11, 2006) (noting that any inference of

discrimination is undermined by the fact that the decision-makers belonged to the same

protected class as the plaintiff))); see also Marlow v. Office of Court Admin., 820 F.

Supp. 753, 757 (S.D.N.Y. 1993), aff'd, 22 F.3d 1091 (2d Cir. 1994) (relying in part on

inference against discrimination where person who participated in the allegedly adverse

decision is also a member of the same protected class); Toliver v. Cmty. Action Comm'n,

613 F. Supp. 1070, 1074 (S.D.N.Y. 1985), aff'd, 800 F.2d 1128 (2d Cir. 1986) (where

decision-maker is in the same protected class as plaintiff, claims of discrimination are

less plausible).

   As for Superintendant Friedman, although he is a white male, Plaintiff has

offered no evidence that he acted with discriminatory intent.  Friedman recommended to

the Board of Education that Ragin be appointed to the assistant principal position in

2002.  (Friedman Aff. ¶ 3)  "[W]here the person who made the decision to fire was the

same person who made the decision to hire, it is difficult to impute to [that person] an

invidious motivation that would be inconsistent with the decision to hire." Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000). Where, as here, a relatively short period of time elapsed between the hiring and firing decision, the same actor inference is a "highly relevant" factor in this Court's inquiry. See Schnabel, 232 F.3d at 91 (finding the "same actor" inference "highly relevant" and affirming a grant of summary judgment where there was a three-year gap between hiring and firing).

In sum, Plaintiff has not offered any evidence raising an inference of discriminatory intent on the part of those who made the decision to terminate her employment. Accordingly, she has not established the fourth element of a prima facie case, and Defendant is entitled to summary judgment on her race discrimination claim.[11]

_____

[11] Even if Ragin had established a prima facie case, Defendant would still be entitled to summary judgment, because it has offered legitimate, non-discriminatory reasons for terminating Plaintiff's employment: Plaintiff was often absent or arrived late to work; was not present during critical time periods such as lunchtime; refused to sign a memorandum setting out her job responsibilities; had "often acted in an unprofessional manner with various staff members, demonstrating a pattern of negative interactions with them"; failed to complete a substantial amount of her assigned work, including her teacher evaluations; and showed consistently weak performance in the areas of "scheduling, budgets, and communications with the Central Administrative offices." (Friedman Aff. ¶ 11, Ex. O; Simmons Aff. ¶¶ 5, 8; Cruz Aff. ¶¶ 10–12)

To defeat summary judgment, Plaintiff must "raise[] sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire [her] was based, at least in part, on the fact" that she is African-American. Holcomb, 521 F.3d at 141. Plaintiff attempts to meet this burden by showing that Defendant's "stated reason[s] for the adverse employment action [are] . . . pretextual." Holcomb, 521 F.3d at 141 (explaining that "in many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive"). However, "[i]n a discrimination case . . . [courts] are decidedly not interested in the truth of the allegations against plaintiff . . . and [instead] are interested in what motivated the employer. . . ." McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) (internal quotation omitted)). Thus, the question is not whether the District gave fair reasons for

**C.**   **Title VII Retaliation Claim**

Courts evaluate Title VII retaliation claims using a three-step burden-

shifting analysis:

---

terminating Plaintiff, but rather whether the District had a good faith belief that Plaintiff's conduct warranted termination.

Here, Plaintiff argues that Defendant's reasons are pretextual because certain of the reasons given are not requirements of her job, such as signing the expectations memo and being present during the school's lunch period.  (Pltf. Br. 12, 14)  However, "[a]bsent a showing by the plaintiff that the employer's demands were made in bad faith, an employer who is sued on allegations of . . . discrimination is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury."  Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 29 (2d Cir. 1997)) (internal quotation omitted).  Ragin also asserts that her classroom observations were not completed in a timely manner because she was unable to type due to a medical condition.  The excuses that Plaintiff offers for her performance deficiencies and lack of cooperation, however, do not demonstrate that Defendant's reasons are pretextual.

At other points, Ragin simply disagrees with Defendant's characterizations of her attitude and assessments of her contribution.  (Pltf. Br. 5; Pltf. Rule 56.1 Resp. ¶ 132)  However, "[t]he mere fact that an employee disagrees with her employer's assessments of her work . . . cannot standing on its own show that her employer's asserted reason for termination was pretextual."  Ricks v. Conde Nast Publ'ns, Inc., 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000).  "Indeed, an employer may terminate an employee for a good reason, bad reason, or no reason at all, provided such reason is not discriminatory."  Gobin v. N.Y. City Health & Hosp. Corp., No. 04 Civ. 3207 (WHP), 2006 U.S. Dist. LEXIS 48952 (S.D.N.Y. July 19, 2006) (citing Malatesta v. Credit Lyonnais, No. 03 Civ. 3690 (MBM), 2004 U.S. Dist. LEXIS 8845, at *7 (S.D.N.Y. Nov. 21, 2005)); see also Slatky v. Healthfirst, Inc., No. 02 Civ. 5182 (JGK), 2003 U.S. Dist. LEXIS 20608, at *5 (S.D.N.Y. Nov. 17, 2003).  In addition, to the extent that Plaintiff relies on the contrast between her earlier favorable performance reviews and Friedman's ultimate criticism of her work, "prior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual.  To hold otherwise would be to hold that things never change, a proposition clearly without basis in reality."  Shabat v. Blue Cross Blue Shield of Rochester Area, 925 F.Supp. 977, 988 (W.D.N.Y. 1996)).

Based on the record before this Court, Plaintiff has failed to present evidence "sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or part on discrimination."  Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997).

> First, the plaintiff must establish a prima facie case.  That is, an employee must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001).  The burden of proof that must be met to permit a Title VII plaintiff to survive a summary judgment motion at the prima facie stage has been characterized as "'minimal' and 'de minimis.'"  Woodman v. WWOR-TV, 411 F.3d 69, 76 (2d Cir. 2005) (quoting Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)).  In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.  See Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).

> If a plaintiff sustains the initial burden, a presumption of retaliation arises.  In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action.  See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998).  Finally, as for the third step, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action.

Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).

A plaintiff may show retaliatory intent with direct evidence "of retaliatory animus directed against the plaintiff" or with circumstantial evidence, including evidence that "the protected activity was followed closely by discriminatory treatment" or evidence of "disparate treatment of fellow employees who engaged in similar conduct." Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) (internal quotation omitted) (describing how a plaintiff may meet her burden at the third stage); see also McNair v. New York City Health & Hosp. Co., 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001) (listing same types of evidence as sufficient to establish fourth element of prima facie case). Moreover, at the third stage, "[u]nder some circumstances, retaliatory intent may also be

shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the [adverse employment action]."  <u>Raniola</u>, 243 F.3d at 625.

Defendant argues that Ragin cannot establish a <u>prima</u> <u>facie</u> case of retaliation because there is no basis to infer a causal connection between the alleged adverse employment actions and her protected activity.  (Def. Br. 13)  For the reasons explained below, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

### 1.     <u>Protected Activity</u>

In considering whether Plaintiff has established a <u>prima</u> <u>facie</u> case of retaliation, this Court must first decide whether Plaintiff engaged in protected activity that was known to the District.  Defendant does not dispute that Plaintiff engaged in protected activity when she submitted a written complaint to Mary Sculnick, the District's Director of Personnel and Title IX coordinator, on June 25, 2004, alleging sexual harassment.  (Def. Br. 14)

Defendant argues, however, that Ragin's verbal complaints to Kaplicer about Manion in November 2003 and January 2004 were not protected activity because "Kaplicer did not consider Plaintiff's remark about Manion as a sexual harassment complaint," nor should Kaplicer have understood the remarks in that manner under the circumstances.  (Def. Reply Br. 9)

To find that a plaintiff engaged in protected activity and that the employer knew about that activity, a court must find that "the employer . . . understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct

prohibited by Title VII." <u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136 F.3d 276, 292 (2d Cir. 1998).  Drawing all rational inferences in Plaintiff's favor, this Court concludes that a rational jury could find that Plaintiff's verbal complaints about Manion constituted protected activity under Title VII.

In the Amended Complaint, Ragin asserts that on two occasions Manion "improperly touched Plaintiff in a sexual manner in a supply closet," and that she reported this sexual harassment to Kaplicer.  (Am. Cmplt. ¶¶ 9-10)  During his deposition, Kaplicer testified that Ragin had come to him in November 2003 and stated, "I don't know what happened, but you need to speak to Manion.  I was in the closet with him and I think he might have touched me."  Kaplicer judged Ragin's affect as "confused, perhaps hurt, and upset, to some degree."  (Sussman Aff., Ex. 2 at 45)

This sort of verbal complaint directly relating to unwanted physical conduct has been deemed to constitute "protected activity" under Title VII.  <u>See Lupacchino v. ADP, Inc.</u>, No. 02 Civ. 2281 (MRK), 2005 U.S. Dist. LEXIS 1687, at *8-9 (D. Conn. Jan. 21, 2005) (determining that "[t]here can be no serious dispute that [plaintiff] engaged in protected activity that was known to [defendant] when she complained verbally to the HR department" regarding another employee who had "purposely brushed her chest").  While Defendant now asserts that Kaplicer did not understand that "the alleged behavior was gender-based" (Def. Reply Br. 9), Kaplicer admits that he confronted Manion and told him that "'Ms. Ragin said that you touched her.'"  Kaplicer advised Manion to "be more careful."  (Sussmann Aff., Ex. 2 at 47; Pltf. Rule 56.1 Resp. ¶¶ 42–45; Sussman Aff., Ex. 1 at 9–11, 15; Johnson Aff., Ex. Q at 8) Kaplicer had also received at least one other complaint about Manion from a female

employee.  (Johnson Aff., Ex. Q at 5-8)  Under all the circumstances, Kaplicer "could

reasonably have understood that plaintiff's opposition was directed at conduct prohibited

by Title VII."  Galdieri-Ambrosini, 136 F.3d at 292.

   The Court concludes that Plaintiff engaged in protected activity on five

occasions prior to her termination:  (1) her verbal complaint to Kaplicer about Manion in

November 2003; (2) her verbal complaint to Kaplicer about Manion in January 2004; (3)

her verbal complaint to Schwartz and Sculnick about Manion in May 2004 (Sculnick Aff.

¶ 5; Schwartz Aff. ¶ 5); (4) her written complaint to Kaplicer about Manion in June 2004

(Johnson Ex. H); and (5) her formal written complaint to Sculnick on June 25, 2004,

concerning the pornographic images and Kaplicer's alleged failure to follow up on her

complaints about Manion.  (Johnson Aff., Ex. J)

## 2.   **Adverse Employment Action**

   To establish a prima facie case of retaliation, Plaintiff must also show that

she suffered an adverse employment action.  In the context of a retaliation claim, an

adverse employment action is one that "well might have dissuaded a reasonable worker

from making or supporting a charge of discrimination."  Burlington N. & Santa Fe R.R.

Co. v. White, 548 U.S. 53, 68 (2006) (internal quotations omitted).  "[P]etty slights,

minor annoyances, and simple lack of good manners" will not normally constitute

adverse employment actions for purposes of a retaliation claim.  Id.  A plaintiff must

show "material adversity," because "it is important to separate significant from trivial

harms." Id. (emphasis in original).  "[A]lleged adverse employment action must be

viewed from the perspective of the reasonable employee, 'because [Title VII's] standard

for judging harm must be objective' to avoid 'the uncertainties and unfair discrepancies

that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.'"

Pacheco v. N.Y. Presbyterian Hosp., 593 F. Supp. 2d 599, 627 (S.D.N.Y. 2009) (quoting

id. at 68-69).

   Although Plaintiff's termination constitutes the only asserted adverse

employment action underlying her race discrimination claim (Pltf. Br. 11-15), Plaintiff's

retaliation claim is based on a much wider array of alleged conduct by Defendant.  In the

retaliation context, a plaintiff can establish an "adverse employment action" by proof

> that "a reasonable employee would have found the challenged action
> materially adverse, which in this context means it well might have
> dissuaded a reasonable worker from making or supporting a charge of
> discrimination."

Alywahby v. Shinseki, No. 01 Civ. 6512 (NGG), 2009 U.S. Dist. LEXIS 120668, at *10-

11 (E.D.N.Y. Dec. 24, 2009) (quoting White, 548 U.S. at 68 (internal quotation marks

omitted)) ; see also Gentile v. Potter, 509 F. Supp. 2d 221, 238-39 (E.D.N.Y. 2007)

(noting that adverse employment actions in the context of a retaliation claim cover a

broader range of conduct than in the discrimination context); Paulose v. N.Y. City Dep't

of Educ., No. 05 Civ. 9353 (DLC), 2007 U.S. Dist. LEXIS 34146, at *35 (S.D.N.Y. May

10, 2007) ("[An] adverse employment action in the context of a retaliation claim is not

limited to actions that effect the terms and conditions of employment . . . [because] on a

retaliation claim, the plaintiff must show that the action 'might have dissuaded a

reasonable worker from making or supporting a charge of discrimination.'") (quoting

Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 207 (2d Cir. 2006)).

   Plaintiff appears to contend that the following constitute adverse

employment actions for purposes of her retaliation claim:

   (1) Kaplicer's January 2004 evaluation;

(2) Kaplicer's June 2004 evaluation;

(3) Kaplicer's failure to commence a sexual harassment investigation after her complaints about Manion;

(4) the District's failure to investigate Plaintiff's complaints of sexual harassment after she had verbally informed Schwartz and Sculnick of the Manion incidents;

(5) Kaplicer's withdrawing of support for the Motown production;

(6) Kaplicer publicly upbraiding Plaintiff;

(7) Kaplicer yelling at Plaintiff when an NAACP official came to visit Lime Kiln;

(8) Failing to provide Plaintiff with necessary accommodation when she lost the use of her hands and could not type her teacher evaluations;

(9) Kaplicer's assigning Plaintiff to investigate the pornographic images that had been downloaded on the school's computers;

(10) the District's decision not to promote Plaintiff to any of the vacant principal positions which she had applied for;

(11) the decision to transfer Plaintiff from Lime Kiln to Fleetwood Elementary; and

(12) Plaintiff's suspension and Superintendant Friedman's recommendation that she be terminated on December 15, 2004.

(See Pltf. Br. 15-25)

### a.  Kaplicer's Negative Evaluations

Plaintiff asserts that Kaplicer's June 2004 evaluation, rating her work as "unsatisfactory," and his January 2004 evaluation – which rated her as satisfactory but contained criticism – constitute adverse employment actions.

In the retaliation context, it is clear from post-White decisions in this Circuit that a negative or critical evaluation will not constitute an adverse employment action unless the evaluation is accompanied by other adverse consequences.  See

32

Martinez-Santiago v. Zurich N. Am. Ins. Co., No. 07 Civ. 8676 (RJH), 2010 U.S. Dist. LEXIS 4246, at *37-38 (S.D.N.Y. Jan. 15, 2010) ("A reasonable employee would not be dissuaded from filing a discrimination complaint merely because her supervisor gave her constructive employment-based criticism."); Pacheco, 593 F. Supp. 2d at 629 ("Plaintiff's supervisor's unfavorable comparison of his work to that of a more senior employee is not actionable as retaliation because Plaintiff provides the Court with no reason to believe that the criticism . . . had any tangible job consequences."); Carmellino v. District 20 of New York City Dep't of Educ., No. 03 Civ. 5942 (PKC), 2006 U.S. Dist. LEXIS 63705, at *95 (S.D.N.Y. Sept. 6, 2006) (holding that negative evaluations were not actionable, especially when they did not result in "any negative consequences").

Here, Plaintiff has presented no evidence that she suffered any direct adverse consequences from Kaplicer's January 2004 and June 2004 evaluations. Plaintiff, however, has argued in conclusory fashion that Kaplicer's evaluations "created a foundation for the adverse actions which followed," including the failure to promote her and the termination decision.  (Pltf. Br. 18)

As to the termination decision, it is clear that the core of the District's complaints about Ragin's performance related to her activities at Fleetwood while she was under the supervision of Principal Simmons.  In the letter Superintendant Friedman provided to Plaintiff at the time of her termination, he discussed a number of tasks that Simmons had assigned and that Ragin had "either not done or done poorly," and then listed the following additional deficiencies in her attitude and performance while at Fleetwood:

> (1) Ragin's failure to integrate technology into the curriculum at Fleetwood;

33

(2) Ragin's failure to collect access forms for the Internet at Fleetwood;
(3) Ragin's refusal to comply with repeated directives from Simmons to sign the welcome letter listing Ragin's tentative assignments;

(4) Ragin's refusal to comply with Simmons' directive that she prepare a mock schedule for Simmons' review;

(5) Ragin's tendency to remain in her own office and failure to participate in Fleetwood's day-to-day operations;

(6) Ragin's failure to comply with a directive to take over the Fleetwood initiative to address students who are consistently late or absent;

(7) Ragin's failure to conduct a "morning walk-through" each day at Fleetwood in order to ensure that teachers were beginning the instructional day in a timely fashion;

(8) Ragin's unavailability during the lunch hour at Fleetwood to provide supervision;

(9) Ragin's failure to develop a list of students in need of tutorial services or organize tutorial services for students at Fleetwood;

(10) Ragin's unprofessional manner with Simmons and the fact that she had "rais[ed] her voice to speak to her";

(11) Ragin's tendency to spend the majority of her time on her computer or cell phone tending to non-school related matters while at Fleetwood;

(12) Ragin's poor attendance at Fleetwood and failure to inform the school of her absences at all, or calling in late in the day;

(13) Ragin's failure to provide a doctor's note for some of her absences;

(14) Ragin's failure to return Dr. Cruz's telephone calls during her time at Fleetwood;

(15) Ragin's belligerent tone with clerical staff; and

(16) Ragin's lack of "a clear vision of how programs and schedules function together within the Fleetwood School."

(Johnson Aff., Ex. O)  Plaintiff has offered no contrary evidence.

Similarly, as to the promotion decision, Plaintiff has offered no evidence indicating that Kaplicer's January 2004 evaluation – which rated her as "satisfactory" and included only minor criticisms – was relied upon during the promotion process.[12] Plaintiff's conclusory suggestion to the contrary is insufficient to create a material issue of fact.  See Jackson v. City Univ. of N.Y., No. 05 Civ. 8712 (JSR), 2006 U.S. Dist. LEXIS 43338, at *3 (S.D.N.Y. June 26, 2006) ("As to the negative employment evaluations plaintiff received, there is no evidence in the record that any negative consequences resulted from those evaluations, nor did plaintiff produce any evidence as to the more general significance of these evaluations in the context of plaintiff's place of employment.  Accordingly, there is no basis to conclude that the negative evaluations were materially adverse to the plaintiff.").

Accordingly, Kaplicer's January 2004 and June 2004 evaluations do not constitute adverse employment actions for purposes of Plaintiff's retaliation claim.

**b.  <u>Failure to Commence Sexual Harassment Investigation</u>**

Ragin claims that Kaplicer, Sculnick, and Schwartz's failures to initiate a sexual harassment investigation after her verbal complaints about Manion constitute adverse employment actions.  (Pltf. Br. 17-18)  The law is clear, however, that such a failure to investigate does not, in and of itself, constitute an adverse employment action in the retaliation context.  As the court explained in O'Dell v. Trans World Entm't Corp., "an alleged deficiency in an employer's internal complaint procedure or internal investigation of a sexual harassment complaint – even if the deficiency is little more than

---

[12]  Kaplicer's June 2004 evaluation could not have influenced Ragin's promotion application, because she was notified that she would not be promoted on May 21, 2004. (Def. Rule 56.1 Stat. ¶ 51)

an attempt to strengthen an employer's defense – is not a retaliatory adverse employment action."  153 F. Supp. 2d 378, 395-97 (S.D.N.Y. 2001); see also Pilgrim v. McGraw-Hill Companies, Inc., 599 F. Supp. 2d 462, 478 (S.D.N.Y. 2009) (finding that failure to investigate complaints of discrimination did not constitute retaliation) (citing Thomlison v. Sharp Elecs. Corp., No. 99 Civ. 9539 (CM), 2000 WL 1909774, at *4 (S.D.N.Y. Dec. 22, 2000) (noting that a failure to investigate is not retaliatory)).

Application of the White standard – which requires that "the challenged action . . . well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," 548 U.S. at 68 – underscores the flaw in Plaintiff's argument. The failure to investigate clearly did not dissuade Plaintiff from pursuing her sexual harassment claim.  For example, Kaplicer's failure to investigate did not dissuade Ragin from making oral complaints to Sculnick and Schwartz, and their failure to investigate did not dissuade Ragin from ultimately filing a written complaint.

Ragin has also not shown any "material adversity" flowing from the alleged initial failures to investigate.  The District eventually conducted a full investigation of Plaintiff's claims and issued a written report concerning them.

### c.  Withdrawing Support for Motown Production, Publicly Upbraiding Plaintiff, Yelling at Plaintiff After NAACP Visit

Kaplicer's alleged withdrawal of support for the Motown production that Plaintiff was involved in organizing does not rise to the requisite level of material adversity required to show an adverse employment action, and represents a trivial harm that would not dissuade a reasonable employee from "making or supporting a charge of

discrimination."  White, 548 U.S. at 68.  Such a "petty slight" is not sufficient under

White.  Id.

        Similarly, assuming arguendo that Kaplicer yelled at Ragin after the

NAACP official visited Lime Kiln, and that Kaplicer publicly upbraided her in front of

other staff, such reprimands without other consequences do not constitute an adverse

employment action.  See Alywahby, 2009 U.S. Dist. LEXIS 120668, at *15-16 (finding

no adverse employment action for purposes of retaliation claim because "reprimands are

routinely considered insufficiently material to constitute adverse action under Title VII");

Nieves v. District Council 37, No. 04 Civ. 8181(RJS), 2009 WL 4281454, at *8

(S.D.N.Y. Nov. 24, 2009) ("Cases within the Second Circuit, interpreting [White], have

held that performance warnings, without more, do not constitute a materially adverse

action."); Lucenti v. Potter, 432 F. Supp. 2d 347, 364 (S.D.N.Y. 2006) ("Reprimands,

threats of disciplinary action, and excessive scrutiny do not constitute adverse

employment actions."); Dunphy v. Delta Airlines, Inc., 290 F. Supp. 2d 311 (E.D.N.Y.

2003) (finding rude comments to, and criticism of, employee following employee's claim

of discrimination not retaliatory where supervisor's comments amounted to mere

annoyances, and employee was not formally disciplined).  Plaintiff has not shown that

these alleged reprimands carried any consequences that might make these acts adverse

employment actions.  See Alywahby, 2009 U.S. Dist. LEXIS 120668, at *15-16 (noting

that "the reprimand does not appear in Plaintiff's personnel file" in determining that it did

not constitute an adverse employment action in the retaliation context).

        **d.  Failure to Provide Plaintiff with Accommodation
            for Her Alleged Medical Condition**

Ragin asserts that Kaplicer was aware that she suffered from a medical condition that made it impossible for her to type, and that his failure to provide an accommodation promptly was a form of retaliation.  (Pltf. Br. 18)  Ragin submitted a doctor's note to the District on May 6, 2004, indicating that she suffered from "arthralgia of hands"[13] and stating that she had "limited use of [her] right hand."  (Ragin Aff., Exs. 35, 36; Pltf. Rule 56.1 Resp. ¶ 75; Ragin Aff. ¶ 26)  On June 8, 2004, the District began providing Plaintiff with an accommodation for the difficulty she was experiencing in typing.  The District took this step same day that she delivered a letter of complaint to Schwartz.  (Ragin Aff., Ex. 21)

Plaintiff has not demonstrated that the District failed to provide her with an accommodation within a reasonable period after she requested it.  The fact that it took the District several weeks after she first complained and submitted a doctor's note to provide an accommodation – typing by the secretarial staff – does not rise to the level of an adverse employment action.  See Shannon v. Verizon N.Y., Inc., No. 05 Civ. 0555 (LEK), 2007 U.S. Dist. LEXIS 28096, at *21-22 (N.D.N.Y Apr. 13, 2007) (finding allegation that "[d]efendant refused to respond to [plaintiff's] complaints in retaliation for protected activity" was unfounded where "in response to his concerns that his condition was being aggravated, Defendant offered Plaintiff the opportunity to request a reasonable accommodation and submit medical documentation in support of the request").

---

[13]  Arthalgia is defined as "sharp, severe pain, extending along a nerve or group of nerves, experienced in a joint and/or joints."  Dorland's Medical Dictionary for Health Consumers (2007), http://medical-dictionary.thefreedictionary.com/arthalgia (last visited Feb. 9, 2010).

Furthermore, the alleged failure to quickly accommodate Plaintiff's condition does not constitute an adverse employment action under Title VII, because Plaintiff's condition did not qualify her as disabled under the Americans With Disabilities Act ("ADA").[14]  As the court explained in Seldon v. Total Sys. Servs., 653 F. Supp. 2d 1349 (M.D. Ga. 2009), a retaliation case, simply because a plaintiff has submitted a doctor's note does not mean that the plaintiff is entitled to an accommodation, and a failure to provide such an accommodation is not in and of itself an adverse employment action:

> [N]o reasonable person in Plaintiff's position could have considered [the supervisor's] alleged failure to adjust Plaintiff's work schedule in 2005 to be materially adverse.  Plaintiff was certainly not entitled to any accommodation based on the 2005 doctor's note alone; "[e]mployers have no duty to accommodate an employee if the employee is not disabled under the [Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA")]."  Swain v. Hillsborough County Sch. Bd., 146 F.3d 855, 858 (11th Cir. 1998).  Plaintiff has not alleged that she is disabled within

---

[14]  While Plaintiff's initial complaint stated a claim under the ADA, Plaintiff's amended complaint dropped the claim.  In any event, there is no evidence that Ragin was disabled under the ADA; she has not shown that "her impairment . . . substantially limit[ed] the major activity of working."  See Smith v. St. Luke's Roosevelt Hosp., No. 08 Civ. 4710 (GBD)(AJP), 2009 U.S. Dist. LEXIS 69995, at *51-52 (S.D.N.Y. Aug. 11, 2009) ("[I]n order for a plaintiff to be found substantially limited in the major life activity of working, the plaintiff must be unable to work in a broad class of jobs . . . accordingly, [t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." (quotations and citations omitted)).  Even if Plaintiff's conditions somehow qualified her as disabled under the ADA, she failed to put the District on notice of such a disability prior to early June – when she formally requested an accommodation for a "disability" – because merely complaining of pain or her symptoms is not sufficient to show that an employer knew that a plaintiff was disabled.  See Cozzi v. Great Neck Union Free Sch. Dist., No. 05 Civ. 1389 (ENV), 2009 U.S. Dist. LEXIS 74305, at *41-42 (E.D.N.Y. Aug. 21, 2009) ("[A]n employer's knowledge of a plaintiff's symptoms does not establish, as a matter of law, that it knew the plaintiff was disabled.") (citing Pacenza v. IBM Corp., No. 04 Civ. 5831 (PGG), 2009 WL 890060, at *10 (S.D.N.Y. Apr. 2, 2009); Watson v. Arts & Entm't Network, No. 04 Civ. 1932 (HBP), 2006 U.S. Dist. LEXIS 50373, at *14 (S.D.N.Y. Mar. 26, 2008) (collecting cases)).

the meaning of the ADA; a reasonable person in Plaintiff's situation
would therefore understand that she might not get an accommodation even
after requesting one.

Id. at 1378-79 (citing White standard for adverse employment action in the retaliation

context).

In sum, the record indicates that the District accommodated Plaintiff's

condition and her difficulty typing in June 2004.  The fact that the District did not act as

promptly as Ragin would have wished does not establish that she suffered an adverse

employment action.

### e.  Direction to Investigate Misuse of School Computers by a Student

Ragin argues that she suffered an adverse employment action when

Kaplicer "assign[ed] [her] to investigate internet misuse involving graphic male

homosexual images," because Kaplicer "could have conducted the investigation himself,

rather than embarrass plaintiff."  (Pltf. Br. 18)

This incident does not constitute an adverse employment action.  It is

undisputed that as Assistant Principal, Ragin was responsible for both student discipline

and technology at Lime Kiln.  (Def. Rule 56.1 Stat. ¶ 78; Schwartz. Aff. ¶ 6; Johnson

Aff., Ex. Y at 120)  In being assigned a task well within her job responsibilities, Ragin

did not suffer an adverse employment action. See Martin v. MTA Bridges & Tunnels,

610 F. Supp. 2d 238, 254 (S.D.N.Y. 2009) ("No reasonable employee would think being

asked to perform tasks that are part of her job description constituted a materially adverse

employment action." (citing White, 548 U.S. at 69)).

### f.  Failure to Promote Plaintiff to Vacant Principal Positions

On February 12, 2004, Plaintiff applied for three vacant principal positions in the District for the 2004–05 school year. (Def. Rule 56.1 Stat. ¶ 32)  After surviving an initial screening process designed to narrow the applicant pool, Plaintiff was interviewed for the Lime Kiln vacancy on March 30, 2004.  (Id. ¶¶ 35-36; Sculnick Aff. ¶ 13; Johnson Aff., Ex. E)  Ragin was one of only thirteen candidates selected for a second-round interview.  (Def. Rule 56.1 Stat. ¶¶ 21, 44)  Plaintiff was not selected as a finalist for the Lime Kiln position, however (Def. Rule 56.1 Stat. ¶¶ 46, 49-50), and the position was ultimately offered to another female African-American candidate.  (Johnson Aff., Ex. P)

Plaintiff asserts that the District's decision not to offer her one of the vacant principal positions constitutes an adverse employment action.  (Pltf. Br. 18-19)  "A decision not to promote an employee to an available position may constitute an adverse action."  Morrison v. Johnson, No. 01 Civ. 636 (RFT), 2006 U.S. Dist. LEXIS 70405, at *46-47 (N.D.N.Y Sept. 28, 2006) (citing Carmellino, 2006 U.S. Dist. LEXIS 63705, at *12-13 (citing Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003))).  Indeed, failure to promote an employee is considered one of the archetypal examples of an adverse employment action under Title VII.  See Treglia v. Manlius, 313 F.3d 713, 720 (2d Cir. 2002) ("[A] claim of discriminatory failure to promote falls within the core activities encompassed by the term 'adverse action.'" (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999))); see also Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (failure to promote is an adverse employment action).

Accordingly, the District's decision not to promote Plaintiff to a vacant principal position constitutes an adverse employment action for purposes of her retaliation claim.

### g.  **Plaintiff's Transfer to Fleetwood Elementary School**

Plaintiff next asserts that her reassignment from Lime Kiln to Fleetwood for the 2004-05 school year constitutes an adverse employment action.

After White, a court analyzing whether a lateral transfer constitutes an adverse employment action in the retaliation context must consider whether such a transfer "well might . . . dissuade[] a reasonable worker from making or supporting a charge of discrimination."  White, 548 U.S. at 68.  In making this determination, courts consider a wide variety of factors, including whether the reassignment or transfer led to a diminution in responsibilities, prestige, or opportunity for advancement.  See, e.g., Pacheco, 593 F. Supp. 2d at 627 (holding that plaintiff's transfer did not constitute an adverse employment action and would not "deter a reasonable employee from complaining about an employer's employment practices" because plaintiff's new job was not "less desirable or disadvantageous than his prior job" and plaintiff had not suffered "adverse consequences"); Alers v. New York City Human Res. Admin., No. 06 Civ. 6131(SLT), 2008 WL 4415246, at *7 (E.D.N.Y. Sep. 24, 2008) (plaintiff's "dissatisfaction with her duties" after transfer, without more (such as a diminution in pay or a loss of prestige), is not a sufficient basis to find that an employment action was materially adverse).

Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205 (2d Cir. 2006) illustrates application of the "adverse employment action" test in the transfer context:[15]

_____

[15]  Although Kessler is an ADEA case, "the same standards and burdens apply to [retaliation] claims under [the ADEA and Title VII]."  Kessler, 461 F.3d at 205.

Applying the White standard to the present case, we conclude that Kessler presented evidence sufficient to create a genuine triable issue as to whether the reassignment to which he was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination.  The evidence . . . viewed in the light most favorable to Kessler, shows that prior to his transfer . . . Kessler had responsibilities and performed functions as set out in the official DSS description of the job of an Assistant Commissioner, and that upon his transfer, . . . although he retained the title of Assistant Commissioner, he was stripped of those responsibilities and not allowed to perform those functions. . . . From this evidence, a rational factfinder could permissibly infer that a reasonable employee . . . could well be dissuaded from making a charge of discrimination if doing so would result in a transfer to an office in which, inter alia, he would not be allowed to perform the broad discretionary and managerial functions of that position, no one would report to him, and he would be forced to do work normally performed by clerical and lower-level personnel.  We conclude that summary judgment on the basis that Kessler failed to adduce evidence that his reassignment was materially adverse was inappropriate.

Kessler, 461 F.3d at 210; see also White, 548 U.S. at 71 ("[T]he jury had before it considerable evidence that the track laborer duties were 'by all accounts more arduous and dirtier'; that the 'forklift operator position required more qualifications, which is an indication of prestige'; and that the forklift operator position was objectively considered a better job.").

Here, Ragin has not succeeded in demonstrating that there is a triable issue of fact as to whether her transfer constituted an adverse employment action.  She has offered no evidence indicating that she suffered any diminution in responsibilities, prestige, managerial authority, or other adverse consequences due to her transfer.  It is undisputed that while at Fleetwood, Ragin had the same job title, pay and benefits that she had enjoyed at Lime Kiln.  (Def. Rule 56.1 Stat. ¶ 104; Friedman Aff. ¶ 8); see Ludwig v. Rochester Psychiatric Ctr., 550 F. Supp. 2d 394, 398 (W.D.N.Y. 2008) (where "reassignment resulted in [plaintiff] performing the same responsibilities on the same

shift for the same compensation" there was no adverse employment action in retaliation context); Grennan v. Nassau County, No. 04 Civ. 2158 (DRH)(WDW), 2007 U.S. Dist. LEXIS 23087, at *30-31 (E.D.N.Y. Mar. 29, 2007) (noting that plaintiff's transfer was not an adverse employment action because it "did not entail a dramatic change, or even any change, in the nature of [plaintiff's] work").  Accordingly, Plaintiff's transfer would not have dissuaded "a reasonable worker from making or supporting a charge of discrimination," White, 548 U.S. at 57, and does not constitute an adverse employment action.

### h.  Plaintiff's Termination

Finally, Plaintiff alleges that her termination constitutes an adverse employment action.  Termination is indeed the archetypal example of an adverse employment action.[16]  See Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) ("Examples of materially adverse changes include termination of employment. . . . ).

### 3.  Causal Connection Between Adverse Employment Actions and Protected Activity

In order for Ragin to establish a prima facie case of retaliation as to the District's failure to promote her to a principal position, and the decision to terminate her employment, she must offer evidence from which a jury could infer a causal connection between these actions and her protected activity.

---

[16]  Although Plaintiff's termination is not – because of her acceptance of the Newburgh principal position – an adverse employment action for purposes of her race discrimination claim, it may constitute an adverse employment action in the retaliation context, where the disputed action "need not affect the terms and conditions of employment." See Memnon, 2009 U.S. Dist. LEXIS 99936, at *20-21 (distinguishing between proof necessary to prevail on race discrimination and retaliation claims in voluntary resignation context).

"Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by [the adverse employment action]" or by evidence of disparate treatment of fellow similarly situated employees, Davis v. State Univ. of New York, 802 F.2d 638, 642 (2d Cir. 1986), or directly through evidence of retaliatory animus addressed to plaintiff by the defendant.  De Cintio v. Westchester County Med. Dep., 821 F.2d 111, 115 (2d Cir. 1987); see also McNair v. New York City Health & Hosp. Co., 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001) (restating same three methods of establishing causal connection).

Here, Ragin has not demonstrated a causal connection between her protected activity and the adverse employment actions, because there is no direct evidence of retaliatory animus by the decision-makers who engaged in the adverse employment actions, there is no evidence of disparate treatment, and the temporal proximity between Plaintiff's protected activity and the adverse employment actions is too attenuated.

### a.  Decision Not to Promote

The District officially notified Plaintiff on May 21, 2004, that she had not been selected to fill one of the vacant principal positions.  (Def. Rule 56.1 Stat. ¶ 51; Johnson Aff., Ex. G)  As discussed above, the District made this decision after Plaintiff had passed through two rounds of interviews.  (Id. ¶¶ 35– 36, 44; Sculnick Aff. ¶ 13, Ex. E; Johnson Aff., Ex. A at 146)  At the initial interview stage, Plaintiff was selected for a second round interview for the Lime Kiln principal position only.  (Def. Rule 56.1 Stat. ¶¶ 39-41)  It is undisputed that no one involved in the first round of interviews had knowledge of Ragin's complaints about sexual harassment.  (Def. Rule 56.1 Stat. ¶ 38)

Ragin's second-round interview for the Lime Kiln principal position took place on April 27, 2004. That committee did not select her as a finalist for the Lime Kiln position, however. (Def. Rule 56.1 Stat. ¶¶ 44, 46) The finalists that were chosen by the committee were then interviewed by Dr. Cruz and other Assistant Superintendants (Def. Rule 56.1 Stat. ¶ 47; Cruz Aff. ¶ 9; Sculnick Aff. ¶ 13), and on May 18, 2004, they selected another female African-American candidate, Lori Lowe-Stokes, for the Lime Kiln principal position. (Def. Rule 56.1 Stat. ¶¶ 46, 48–50)

Although Ragin was officially notified on May 21, 2004, that she would not be promoted, it is not disputed that this decision was made between her second-round interview on April 27, 2004, and May 12, 2004. See Sculnick Aff. ¶ 13 (stating that the decision was made between April 27, 2004, when the second-round interviews ended, and May 12, 2004).

As discussed above, this Court has determined that Plaintiff engaged in protected activity when she (1) verbally complained to Kaplicer about Manion in November 2003, (2) verbally complained to Kaplicer about Manion in January 2004, (3) verbally complained to Schwartz and Sculnick about Manion on May 12, 2004 (Sculnick Aff. ¶ 5; Schwartz Aff. ¶ 5), (4) submitted a written complaint about Manion to Kaplicer on June 4, 2004 (Johnson Ex. H), and (5) submitted a formal written complaint to Sculnick alleging sexual harassment on June 25, 2004. (Johnson Aff., Ex. J)

Only the two verbal complaints to Kaplicer in November 2003 and January 2004 preceded the decision not to grant Plaintiff a final-round interview for the Lime Kiln position. Three months or more elapsed between Ragin's January 2004 protected activity and the failure to grant her a final round interview for the Lime Kiln

vacancy.  Although the Second Circuit "has not drawn a bright line to define the outer

limits beyond which a temporal relationship is too attenuated to establish a causal

relationship," Gorman-Bakos v. Cornell Co-op Extension of Schenectady, 252 F.3d 545,

554 (2d Cir. 2001), many courts in this circuit have held that periods of two months or

more defeat an inference of causation.  See, e.g., Harrison v. North Shore Univ. Hosp.,

No. 04 Civ. 2033 (WDW), 2008 WL 656674, at *12 (E.D.N.Y. March 6, 2008) ("[C]ase

law indicates that a gap of up to one to two months between the protected activity and the

adverse action may establish the requisite causal connection," while "[l]onger gaps . . .

have been found to be too attenuated to establish a causal connection."); Garrett v.

Garden City Hotel, Inc., No. 05 Civ. 0962 (JFB) (AKT), 2007 WL 1174891, at* 21

(E.D.N.Y. Apr. 19, 2007) (no causal connection found where there was a two-and-a-half

month gap between protected activity and adverse employment action); Yarde v. Good

Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the

outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an

inference of causation."); Hussein v. Hotel Employees & Rest. Union, Local 6, No. 98

Civ. 9017 (SAS), 2002 WL 10441 (S.D.N.Y. Jan. 3, 2002) (two month gap defeats

retaliatory nexus); Nicastro v. Runyon, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999)

("Claims of retaliation are routinely dismissed when as few as three months elapse

between the protected EEO activity and the alleged act of retaliation."); Ponticelli v.

Zurich Am. Ins. Group, 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (two-and-a-half month

gap too long to give rise to inference of causal connection); but see Burkybile v. Bd. of

Educ. of the Hastings-on-Hudson Union Free Sch. Dist., 411 F.3d 306, 314 (2d Cir.

2005) (stating that this Circuit "has not established a specific delay between protected

activity and adverse employment action that defeats an inference of causation" and noting that an inference of retaliatory intent has been found in cases involving a gap of as long as eight months).  There is no reason to vary from the general rule here.

Even if the time period between Ragin's protected activity and the alleged retaliatory act was not too attenuated, however, she has failed to demonstrate that anyone involved in the decision not to grant her a final round interview for the Lime Kiln principal vacancy was aware they she had complained about sexual harassment.  Without such proof, Ragin's retaliation claim must fail.  See Lindner v. IBM, No. 06 Civ. 4751 (RJS), 2010 U.S. Dist. LEXIS 6499, at *10-11 (S.D.N.Y. Jan. 21, 2010) ("The first deficiency in Plaintiff's retaliation claims is that there is no admissible evidence showing that . . . the individuals alleged to have provided Plaintiff's prospective employers with negative references . . . knew that Plaintiff had engaged in protected activity prior to Plaintiff's filing this lawsuit.") (citing Philippeaux v. Fashion Inst. of Tech., No. 93 Civ. 4438 (SAS), 1996 WL 164462, at *6 (S.D.N.Y. Apr. 9, 1996) (noting that a retaliation claim requires the actual decision-maker to have knowledge of the plaintiff's protected activity)); Murray v. Visiting Nurse Servs. of NY, 528 F. Supp. 2d 257, 271 (S.D.N.Y. 2007) ("[D]istrict courts have consistently held that, with regard to the causation prong of the prima facie standard, absent any evidence to support an inference that the decisionmakers knew of plaintiff's complaints, plaintiff cannot rely on circumstantial evidence of knowledge as evidence of causation."); Laurin v. Pokoik, No. 02 Civ.1938 (LMM), 2005 WL 911429, at *5 (S.D.N.Y. April 18, 2005) (noting that, in order to establish a prima facie case of retaliation, the plaintiff "must demonstrate not only that [the defendant corporation] as an entity knew of [the plaintiff's] engagement in the

protected activities, but also that the actual decisionmaker(s) knew about her protected activities as well").

Plaintiff offers no evidence that anyone other than Kaplicer knew of her protected activity before May 12, 2004, when she first informed Sculnick and Schwartz of her allegations.  (Sculnick Aff. ¶ 5; Schwartz Aff. ¶ 5)  While Assistant Superintendant Cruz was involved in the interview process for all three positions that Ragin applied for, there is no evidence that Cruz knew of Plaintiff's harassment allegations when any of the promotion decisions were made.  Similarly, Superintendant Friedman states in his affidavit that he first became aware of Ragin's sexual harassment allegations in June 2004, after the promotion decision was made.  (Friedman Aff. ¶7)  There is likewise no evidence that anyone who served on the initial and second round interview committees was aware of Ragin's sexual harassment complaints.

Because the record demonstrates that only Kaplicer was aware of Ragin's protected activity when her bid for promotion was rejected, Ragin's promotion-related retaliation claim can survive only if she has offered proof that Kaplicer played a direct role in, or influenced, the decision not to promote Plaintiff to the vacant principal positions.  Plaintiff has offered no such evidence as to the non-Lime Kiln principal positions.  With respect to the Lime Kiln position, Ragin has failed to offer evidence that Kaplicer was a member of the committee that decided not to select her as a finalist, and Defendant has offered contrary evidence.  (Kaplicer Aff. ¶ 4; Johnson Aff., Ex. A at 145-46)

Plaintiff alleges in her affidavit, however, that Kaplicer selected the teachers who served on the interview committee for the Lime Kiln vacancy.  (Ragin Aff.

¶ 17)  There is no evidence that Kaplicer said or communicated anything to these teachers about Ragin, however, or that he told them that she had complained of sexual harassment. While Plaintiff claims that "Kaplicer spoke with a parent, Marci, who advised a teacher at the school, Andi Kramer, that he [i.e., Kaplicer] would do all in his power to see that I did not become principal" (Ragin Aff. ¶ 18), this is inadmissible hearsay that cannot be relied on to oppose a summary judgment motion.  See Fed. R. Civ. P. 56(e)(1) (stating that affidavit opposing summary judgment "must be made on personal knowledge, set[ting] out facts that would be admissible in evidence"); Feingold v. New York, 366 F.3d 138, 155 n.17 (2d Cir. 2004) ("In reviewing the district court's grant of summary judgment, . . . we may only consider admissible testimony.").

Because Ragin has not offered evidence that any decision-maker was aware of her protected activity when her bid for promotion was rejected, she has not demonstrated causation, and thus the District is entitled to summary judgment on her promotion-related retaliation claim.

### b.  Termination

On December 14, 2004, Ragin's direct supervisor, Principal Patricia Simmons, sent a memorandum to Assistant Superintendant Cruz requesting that Plaintiff be terminated. (Johnson Aff., Ex. N)  On December 15, 2004, Cruz sent a memorandum to Superintendent Friedman concurring in Simmons' recommendation (Johnson Aff., Ex. U), and on December 15, 2004, Superintendant Friedman sent a letter to Ragin notifying her of his decision to recommend to the Board of Education that her employment be terminated.  (Johnson Aff., Ex. S)

As noted above, a plaintiff who suffers an adverse employment action can demonstrate a causal connection between the action and her protected activity by showing "(1) direct proof of retaliatory animus directed against the plaintiff; (2) disparate treatment of similarly situated employees; or (3) that the retaliatory action occurred close in time to the protected activities." McNair, 160 F. Supp. 2d at 604.  Because Ragin has made no disparate treatment argument, her termination-related retaliation claim fails unless she has offered proof of retaliatory animus on the part of the decision-makers, or has demonstrated that her termination took place close in time to her protected activity.

Plaintiff has offered no evidence of retaliatory animus on the part of the three individuals who were part of the decisional chain that effected her termination: Simmons, Cruz, and Friedman.[17]  As to Cruz, Plaintiff attempts to demonstrate that she exhibited retaliatory animus when she reprimanded Ragin in a June 2, 2004 memorandum for not appearing for a scheduled meeting.  (Ragin Aff., Ex. 16)  Ragin claims that she had obtained permission from Kaplicer to attend a wedding that day. (Pltf. Br. 24; Ragin Aff. ¶ 22, Ex. 3)  The fact that Cruz reprimanded Plaintiff for missing a previously-scheduled meeting, however, is no evidence of retaliatory animus, particularly given Plaintiff's allegation that Cruz reprimanded her because Kaplicer had represented to Cruz that Plaintiff was "AWOL."  (Pltf. Br. 4; Pltf. Rule 56.1 Counter-Stat. ¶¶ 95–96)

As to Superintendent Friedman, Plaintiff offers no evidence and no argument that he acted with retaliatory animus.

---

[17]  Defendant does not dispute that Cruz and Friedman were aware that Plaintiff had complained of sexual harassment when they recommended her termination.  See Friedman Aff. ¶ 6.

As to Simmons, Ragin points to the fact that when she first arrived at Fleetwood, Simmons asked her to sign a document listing her job responsibilities and Simmons' expectations.  Ragin notes that Simmons' list was not District-approved.  (Pltf. Br. at 7-8)  Simmons used this same sort of expectations and duties memorandum with at least two other assistant principals, however, and obtained the list of job responsibilities from another principal in the District who used it as a management tool.  (Simmons Reply Aff. ¶ 2)  Neither Simmons' use of this list nor her critical evaluation of Plaintiff's work performance constitutes direct evidence of retaliatory animus.

Plaintiff is thus left to establish a causal connection by showing temporal proximity between her protected activity and her termination.  Here, this proximity is lacking, because Plaintiff's last protected activity occurred on June 25, 2004, when she submitted a formal written complaint to Sculnick alleging sexual harassment by both Manion and Kaplicer.  (Johnson Aff., Ex. J)  Simmons, Cruz and Friedman made their recommendations concerning Plaintiff's termination on December 14 and 15, 2004. Accordingly, nearly six months elapsed between Plaintiff's termination and her last involvement in protected activity.

As discussed above in connection with Plaintiff's promotion-related retaliation claim, although there is no bright line rule as to when "a temporal relationship is too attenuated to establish a causal relationship," Gorman-Bakos, 252 F.3d at 554, many courts have held that a two month gap between protected activity and an adverse employment action defeats an inference of causation.  See supra pp. 47-48.  "[B]ecause the Second Circuit has found periods well beyond two months to be sufficient to suggest a causal relationship under certain circumstances, [however,] courts must carefully

52

consider the time lapse in light of the entire record."  Grana, 2009 U.S. Dist. LEXIS 13159, at *37-38.

Here, the nearly six month gap between Plaintiff's protected activity and her termination defeats any inference of causation.  Plaintiff's sole support for her termination-related retaliation claim is temporal proximity.  Moreover, the only supervisor that Plaintiff even alleges expressed animosity towards her retired six months before her termination, and there is no evidence that he influenced the decision-makers in any fashion.  Under these circumstances, the six month gap between Plaintiff's termination and her protected activity is too attenuated to suggest a causal connection.  Accordingly, though the burden of establishing a prima facie case is "de minimis," Plaintiff has not offered evidence meeting that minimal standard.  See Jute, 420 F.3d at 173.

### 4.     Legitimate Non-Discriminatory Reasons and Pretext

Even if Plaintiff had established a prima facie case of retaliation, Defendant has come forward with non-retaliatory reasons for its decision to terminate Plaintiff's employment.  See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998).

In his December 22, 2004 letter to Ragin, Superintendant Friedman laid out a litany of performance-related reasons for why he had recommended Plaintiff's termination, including:  (1) her failure to complete a number of her work assignments; (2) her frequent failure to respond to supervisors' directives; (3) her failure to complete her classroom observations in a timely manner; (4) her weak performance in the areas of scheduling and budgeting; (5) her refusal to sign Principal Simmons' expectations and

duties memorandum, (6) her failure to participate adequately in Fleetwood's day-to-day operations, (7) her failure to conduct morning walk-throughs as instructed by her supervisor, (8) her unavailabilty during student lunch hour to provide supervision, (9) addressing her supervisor in an unprofessional manner, (10) her negative interactions with staff members, (11) time spent on non-school related matters during the school day; (12) her poor attendance, frequent failure to give the school advance notice of her absences, and failure to provide doctor's notes; and (13) her failure to return phone calls from Assistant Superintendant Cruz on multiple occasions.  (Johnson Aff., Ex. O)

The performance-related reasons offered by Defendant for its termination decision are sufficient to meet Defendant's burden.  See Auguste v. New York Presbyterian Med. Ctr., 593 F. Supp. 2d 659, 666 (S.D.N.Y. 2009) ("[P]oor work performance has often been recognized as a legitimate, non-discriminatory reason for termination" in retaliation cases); Weber v. Parfums Givenchy, Inc., 49 F. Supp. 2d 343, 357 (S.D.N.Y. 1999) (employer's explanation that employee had a "poor attitude" and did not work well with co-workers was "sufficient to meet its burden" of articulating a legitimate non-discriminatory reason for adverse employment action).

Because Defendant has produced legitimate, non-retaliatory reasons for its actions, "the presumption of retaliation dissipates," and Plaintiff must offer evidence from which a jury could find "that retaliation was a substantial reason for the adverse employment action."  Jute, 420 F.3d at 173.  The Second Circuit has recognized that "under some circumstances, retaliatory intent may . . . be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the [adverse employment action]."  Raniola, 243 F.3d at 625.  Moreover, summary

judgment may be improper where there is evidence that the defendant's proffered reasons are partially pretexual.  See, e.g., Ebanks v. Neiman Marcus Group, Inc., 414 F. Supp. 2d 320, 331 (S.D.N.Y. 2006) (summary judgment inappropriate because there were genuine factual disputes as to whether employer's reasons for the adverse employment actions "were in part pretextual"); Rooney v. Capital Dist. Transp. Auth., 109 F. Supp. 2d 86, 98-99 (N.D.N.Y. 2000) (summary judgment inappropriate because there was "a sufficient basis for a trier of fact to conclude . . . that the reasons defendant offered for plaintiff's dismissal were at least partially pretextual").

Here, Plaintiff has not offered evidence that the reasons given for her termination were pretextual.  Indeed, Plaintiff does not so much challenge Defendant's account of her performance deficiencies as supply arguments as to why Defendant should have excused those deficiencies.  This is not sufficient to establish pretext.

With respect to Simmons' expectations/duties list, for example, Plaintiff argues that her refusal to sign it was justified, because such a list was "not in general use in the district."  (Pltf. Br. 12)  Simmons supplied an affidavit, however, demonstrating that she and at least one other principal had used such a list in the past with other assistant principals.  (Simmons Reply Aff. ¶ 2)  This assertion stands unrebutted.  Even if Simmons had not used such a list before as a management tool, Ragin does not explain why it was improper for Simmons to use it in her case.

Similarly, with respect to her frequent absences, Plaintiff does not deny that she was absent twenty-two days during the September to mid-December time period. Instead, she argues that she was entitled under her union contract to twenty-two sick days a year, and had not exceeded that number.  (Pltf. Br. 12; Ragin Aff., Ex. 44)  Clearly, the

School District was entitled to take into account, however, the fact that Ragin had used

her entire annual allotment of sick days in a three month period and had not always

obtained doctor's notes justifying those absences. (Johnson Aff., Ex. O)

    With respect to Defendant's assertion that Ragin was frequently late to

work, left early, and left the building during lunch breaks, Ragin simply denies such

conduct.  Plaintiff adopts a similar approach with respect to her alleged failure to

complete work assignments.  Such bare assertions in Plaintiff's own affidavit are not

sufficient to defeat summary judgment, however.  See, e.g., Giglio v. Buonnadonna

ShopRite, LLC, No. 06 Civ. 5191 (JS), 2009 U.S. Dist. LEXIS 90111, at *16-17

(E.D.N.Y. Sept. 25, 2009) ("Plaintiff cites his own self-serving affidavit as the only piece

of evidence. . . . [Such] 'unsupported allegations do not create a material issue of fact.'")

(quoting Weinstock, 224 F.3d at 41).

    While Ragin clearly disagrees with Defendant's evaluation of her job

performance, "[t]he mere fact that an employee disagrees with her employer's

assessments of her work . . . cannot standing on its own show that her employer's

asserted reason for termination was pretextual."  Ricks, 92 F. Supp. 2d at 347; see also

Taylor v. Records, No. 94 Civ. 7689 (CSH), 1999 WL 124456, at *10 (S.D.N.Y. March

8, 1999) (plaintiff's attempt to rebut employer's explanation "by parsing the details of

selected incidents, generally disputing her supervisors' assessments, and providing her

own contrary appraisal of her work, is unavailing" in showing that firing was pretextual).

    Ragin has not demonstrated that Defendant's proffered reasons for her

termination were pretextual, and has offered no evidence "that retaliation was a

substantial reason for the adverse employment action."  Jute, 420 F.3d at 173.

Accordingly, Defendant is entitled to summary judgment on her retaliation claim.

    **D.**    **Hostile Work Environment Claim**

      "To prevail on a claim of sexual harassment based on a hostile work

environment, a plaintiff must establish two elements:  "'(1) that the workplace was

permeated with discriminatory intimidation that was sufficiently severe or pervasive to

alter the conditions of her work environment, and (2) that a specific basis exists for

imputing the conduct that created the hostile environment to the employer."'"  Petrosino

v. Bell Atl., 385 F.3d 210, 221 (2d Cir. 2004) (quoting Mack v. Otis Elevator Co., 326

F.3d 116, 122 (2d Cir. 2003), cert. denied, 540 U.S. 1016 (2003) (quoting Richardson v.

N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999))).

      Satisfying this standard entails "showing both 'objective and subjective

elements:  the misconduct shown must be severe or pervasive enough to create an

objectively hostile or abusive work environment,' and the [plaintiff] must also

subjectively perceive that environment to be abusive."  Feingold v. New York, 366 F.3d

138, 150 (2d Cir. 2004) (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002))

(internal quotation omitted).  "As a general rule, incidents must be more than 'episodic;

they must be sufficiently continuous and concerted in order to be deemed pervasive.'"

Alfano, 294 F.3d at 374 (quoting Perry, 115 F.3d at 149).  "Isolated acts, unless very

serious, do not meet the threshold of severity or pervasiveness."  Alfano, 294 F.3d at 374;

see Petrosino v. Bell Atlantic, 385 F.3d 210, 224 (2d Cir. 2004) ("isolated incidents of

offensive conduct (unless extremely serious) will not support a claim of discriminatory

harassment").  "But it is well settled in this Circuit that even a single act can meet the

threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." Alfano, 294 F.3d at 374.

Here, Plaintiff's hostile work environment claim rests on her allegations that (1) custodian Manion grazed her buttocks on two occasions, and (2) that Kaplicer improperly directed her to investigate pornographic images printed out on a school computer. (Pltf. Br. 24)

As discussed above in connection with Ragin's retaliation claim (see supra p. 40), Kaplicer's request that Ragin investigate pornographic images that had been printed from a school computer was entirely proper. Plaintiff was responsible for both student discipline and technology at Lime Kiln, and Kaplicer's request fell well within her job responsibilities. There is no evidence that Kaplicer's request was anything other than a routine assignment, and certainly there is no suggestion in the record that Kaplicer gave Ragin this assignment because of her sex. Under such circumstances, a supervisor's request that an employee perform a task within the employee's job description cannot provide a basis for a hostile work environment claim. See Alfano, 294 F.3d at 378. ("Facially neutral incidents may be included, of course, among the totality of the circumstances that courts consider in any hostile work environment claim [so long as a] reasonable fact-finder could conclude that they were, in fact, based on sex. . . . [This inference] requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory.").

Ragin's allegation that Manion grazed her buttocks on two occasions is likewise insufficient to make out a hostile work environment claim. As noted above, "'[a]s a general rule, incidents [forming the basis for a hostile work environment claim]

must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive'. . . . Conduct that is 'merely offensive, unprofessional or childish is not discriminatory conduct proscribed by Title VII.'" Trinidad v. New York City Dep't of Corr., 423 F. Supp. 2d 151, 164 (S.D.N.Y. 2006) (quoting Alfano, 294 F.3d at 373; Cosgrove v. Federal Home Loan Bank, No. 90 Civ. 6455 (RPP), 92 Civ. 4225 (RPP), 1999 U.S. Dist. LEXIS 7420, at *20 (S.D.N.Y Mar. 23, 1999)). "[A] plaintiff 'must establish both that [s]he subjectively perceived the environment to be abusive and that a reasonable person would have perceived it as such.'" Trinidad, 423 F. Supp. 2d at 164 (S.D.N.Y. 2006) (quoting Perks v. Town of Huntington, 251 F. Supp. 2d 1143, 1155 (E.D.N.Y. 2003)).

   Here, the Manion incidents that took place in November 2003 and January 2004 are not sufficient to make out a hostile work environment claim.  As an initial matter, Ragin's account of these episodes has changed over time.  In her June 4, 2004, memorandum to Kaplicer, Ragin described the incidents as follows:

> In November 2003, I asked Mr. Robert Manion, the Head Custodian at Lime Kiln at the time, to get some construction paper for me.  He unlocked the door to the supply closet and we both entered.  I began looking at the different color construction paper when I felt Mr. Manion's hand graze upon my buttock.
>
>  *  *  *   *
>
> On or about January 24, 2004, I had the need to ascertain [sic] some supplies.  The storage room was locked.  I asked Mr. Robert Manion to open the door.  This time I entered the storage room alone.  I was searching the shelves for some binders when Mr. Robert Manion entered the storage room.  He asked me what I was looking for and I stated some binders.  As he drew near in an attempt to look for the binders, his hand grazed my buttocks again.

(Johnson Aff., Ex. H) (emphasis added)  In her opposition brief, however, one of the Manion grazing incidents has been transformed into "cupping":  "Manion cupped his

hands around plaintiff's buttocks." (Pltf. Br. 2) There is no supporting citation for this assertion, and it will be disregarded.

Ragin's claim that Manion's hand grazed her buttocks in November 2003 and January 2004 does not allege severe enough conduct to have created the type of pervasively hostile environment that is required to state a hostile work environment claim. See, e.g., Quinn v. Green Tree Credit Corp., 159 F.3d 759, 763-64 (2d Cir. 1998) (rejecting hostile work environment claim where co-worker "brushed against [plaintiff's] breasts with papers he was carrying"); Lewis v. N. Gen. Hosp., 502 F. Supp. 2d 390 (S.D.N.Y. 2007) (three incidents of male plaintiff's female supervisor brushing her breasts up against him in a three-month period were not objectively severe); Ballance v. Energy Trans. Corp., No. 00 Civ. 9180 (LMM), 2001 WL 1246586, at *11 (S.D.N.Y. Oct. 18, 2001) (holding that one incident in which defendant allegedly untied plaintiff's apron and touched her buttocks did not "amount to an environment permeated with discrimination"); Salvatore v. KLM Royal Dutch Airlines, No. 98 Civ. 2450 (LAP), 1999 U.S. Dist. LEXIS 15551, at *31 (S.D.N.Y. Sept. 30, 1999) (holding that allegations that plaintiff's supervisor "brushed up against her on 'some occasions'" were insufficient to support claim of hostile work environment); Francis v. Chemical Banking Corp., 62 F. Supp. 2d 948, 959 (E.D.N.Y. 1999) (no actionable conduct where supervisor "brushed his hand against [plaintiff's] buttocks"); Gregg v. New York State Dep't of Taxation and Finance, No. 97 Civ. 1408 (MBM), 1999 WL 225534, at *12 (S.D.N.Y. Apr.15 1999) (finding four instances of touching, including a "pat on the behind," over a three to four month period not "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'") (quoting Harris v. Forklift

Sys., 510 U.S. 17, 21 (1993)); Lucas v. S. Nassau Communities Hosp., 54 F. Supp. 2d 141, 147 (E.D.N.Y. 1998) (dismissing sexual harassment claims where plaintiff alleged that her supervisor had briefly touched her on several occasions).  The two brief, isolated acts of touching alleged by Ragin do not meet the requisite threshold of severity or pervasiveness.  Alfano, 294 F.3d at 374 ("Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness.").

Recognizing that the two Manion incidents do not make out a hostile work environment claim, Plaintiff's opposition brief lists fourteen other acts allegedly committed by Kaplicer that, according to Plaintiff, demonstrate that Ragin was "subjected to a hostile work environment":

(1)  False criticism of Ragin in her January 2004 performance review;

(2)  Withdrawing support from the Motown production;

(3)  Publicly upbraiding Ragin in front of staff;

(4)  Allowing staff to treat Ragin rudely;

(5)  Screaming at Plaintiff because of the presence of the NAACP;

(6)  Publicly announcing that he would block plaintiff from succeeding him as principal;

(7)  Failing to accommodate her medical condition;

(8)  Not informing Cruz on the day of the June 1, 2004 meeting that Ragin had taken a personal day;

(9)  Allowing Manion to visit the school after he retired;

(10)  Continuing not to provide accommodations to plaintiff even after being directed to do so;

(11)  Demanding an accounting for the Motown event three months after it

had been held;

(12)  Fabricating his June 11, 2004 review in a manner contrary to prior

reviews dealing with the same issues;

(13)  Providing a baseless unsatisfactory end of the year evaluation which,

without mention of the failure to provide timely, reasonable

accommodation, discredits Ragin for not completing teacher reviews in a

timely manner; and

(14)  Assigning plaintiff to do an investigation which Kaplicer knew

would embarrass her and which he could have done himself.

(Pltf. Br. 25-26)

These incidents do not demonstrate that Ragin was subjected to a hostile

work environment, because they all reference facially-neutral, work-related conduct.

See, e.g., Walter v. Westdeutscher Rundfunk, ARD German Radio N.Y., No. 03 Civ.

5676 (LAK)(JCF), 2004 U.S. Dist. LEXIS 8181, at *15-16 (S.D.N.Y. May 11, 2004)

(Report and Recommendation adopted by District Court) (allegations that plaintiff was

"criticized . . . given conflicting orders . . . and harassed about her visa" are not

"cognizable in a Title VII claim of sexual harassment" because they "are not gender

based");

Gregg v. New York State Dep't of Taxation and Finance, No. 97 Civ.

1408 (MBM), 1999 WL 225534 (S.D.N.Y. Apr.15 1999) is instructive on this point.  In

Gregg, the plaintiff attempted to support his hostile work environment claim by citing

such facially-neutral incidents as a "requirement that he check in via e-mail every day,"

"the demand that he move his office nearer [to his supervisor], his increased workload, [and] his loss of a state car." Id. at *13.  The court determined that "these incidents do not rescue [plaintiff's] claims, either because they were unobjectionable or insufficiently pervasive and abusive." Id; see also Trinidad, 423 F.Supp. 2d at 168 ("[E]xamining the totality of the circumstances here, most of which comprise unrebutted facially neutral behavior that plaintiff has failed to clothe in discriminatory dress, plaintiff's claim . . . clearly fails to meet the necessary standard for actionable gender hostility." (quotations omitted)).

Because Plaintiff's allegations and evidence fail to make out a hostile work environment claim, Defendant is entitled to summary judgment on this claim.

### CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is GRANTED.  The Clerk of the Court is directed to terminate Defendant's motion (Docket No. 25) and to close this case.

Dated:  New York, New York
        March 31, 2010

                                SO ORDERED.


                                _Paul G. Gardephe_

                                Paul G. Gardephe
                                United States District Judge

63